

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-10-2000

# Fuentes v Wagner

Precedential or Non-Precedential:

Docket 99-1062

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Fuentes v Wagner" (2000). *2000 Decisions*. Paper 51.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/51

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 10, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1062

LUIS FUENTES,

      Appellant

v.

WAGNER, WARDEN; KONEMANN,
CORRECTIONAL OFFICER; KLEEMAN, CORRECTIONAL
OFFICER; DONATO, CORRECTIONAL OFFICER; BROWN,
SERGEANT; WERST, ASSISTANT WARDEN, BERKS
COUNTY

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civil Action No. 96-CV-03251)
United States Magistrate Judge: Hon. M. Faith Angell

Argued: December 15, 1999

Before: MANSMANN, GREENBERG and McKEE,
Circuit Judges

(Filed: March 10, 2000)

        STEPHEN D. BROWN, ESQ.
        CAROLYN H. FEENEY, ESQ.
        EVERETT M. CLAYTON, ESQ.1
         (Argued)
        Dechert, Price & Rhoads
        4000 Bell Atlantic Tower
        1717 Arch Street
        Philadelphia, PA 19103
        Attorneys for Appellant

        DANIEL J. DIVIS, ESQ.
        MARGARET A. McALLISTER, ESQ.
         (Argued)
        German, Gallagher & Murtagh
        The Bellevue
        200 South Broad Street
        Suite 500
        Philadelphia, PA 19102
        Attorneys for Appellees

OPINION OF THE COURT

McKEE, Circuit Judge.

Luis Fuentes appeals a judgment that was entered for the
defendant corrections officers and prison officials in this
suit under 42 U. S. C. S 1983. The suit arose from an
incident that occurred in the Berks County Prison where
Fuentes was detained while awaiting sentencing on
outstanding federal charges. Fuentes alleged a cause of
action for excessive force under the Eighth and Fourteenth
Amendments, a substantive due process claim for cruel and
unusual punishment under the Eighth and Fourteenth
Amendments, a procedural due process claim under the

_____

1. Mr. Fuentes was granted in forma pauperis status, and counsel agreed
to represent him pro bono. We express our appreciation for the service
counsel provided the court, and the quality of their advocacy on behalf
of Mr. Fuentes.

2

Fourteenth Amendment, and state law claims for assault
and battery, and false imprisonment.[2]

Cross-motions for summary judgment were eventually
filed, and the Magistrate Judge to whom the matter had
been assigned granted summary judgment in favor of the
prison officials on Fuentes' substantive due process claim,
but denied summary judgment on the remaining claims.
Those remaining claims then proceeded to trial, and a jury
returned a verdict in favor of the defendants. Fuentes' post-
trial motions were denied, and this appeal followed. [3] We will
affirm.

I. BACKGROUND

In December of 1995, Fuentes was being housed in the
behavioral adjustment unit ("BAU") of the Berks County
Prison awaiting sentencing on federal drug charges to
which he had previously pled guilty. His cell was typical of
the cells in the BAU. It measured approximately 6 by 10
feet and contained only a sink, a toilet, and a cement slab.

On December 28, 1995, the inmates in the BAU were not
allowed their one-hour exercise period outdoors because of
inclement weather. Instead, they were individually released
from their cells to exercise in the hallway immediately
outside their respective cells. After another inmatefinished
exercising, Fuentes began kicking his own cell door and
yelling for a Correctional Officer ("CO"). [4] CO Konemann and
CO Kleeman came to Fuentes' cell, and Fuentes complained

that another inmate had urinated into Fuentes' cell. Neither Konemann nor Kleeman saw any urine on Fuentes' cell floor. However, Kleeman did notice some wetness on the door and the floor outside of Fuentes' cell.

_____

2. Fuentes filed a pro se complaint on January 11, 1996. Thereafter, he was granted ifp status and counsel was appointed to represent him. A first amended complaint was filed on February 28, 1997, and a second amended complaint was filed on November 14, 1997.
3. All parties consented to have the Magistrate Judge conduct the proceedings under 28 U. S. C. S 636(c)(1). Fuentes retained the right to appeal directly to us under 28 U. S. C. S 636(c)(3).

4. Fuentes knew that kicking his cell door was a violation of the rules of the BAU.

Policy requires that a CO handcuff an inmate who is housed in the disciplinary unit before entering his cell. Accordingly, Konemann and Kleeman told Fuentes to extend his hands through the food slot of his cell door so that they could handcuff him and enter his cell. Fuentes complied, and was handcuffed. The COs entered and told Fuentes they were going to strip his cell because he had kicked his cell door.5 However, as Konemann began removing sheets from Fuentes' bed in an effort to strip the cell, Fuentes grabbed the sheets and a struggle ensued. The parties offer different versions of exactly what happened next.

According to the defendants, Fuentes swung at Konemann's head with his handcuffed fists after unsuccessfully trying to grab the sheets. Konemann stated he saw Fuentes' swing, and that he pushed Fuentes backwards. When Fuentes moved back toward Konemann, Kleeman stepped forward and wrestled Fuentes to thefloor. Fuentes was then face down on the cell floor with his handcuffed arms beneath him. Kleeman was partially on top of Fuentes as Konemann assisted in holding Fuentes down. According to the defendants, Fuentes was combative and was trying to free himself as Konemann and Kleeman tried to control him.

CO Donato arrived shortly after Konemann and Kleeman began stripping the cell, but Donato left to get leg shackles and to call for assistance. After Donato retrieved the leg shackles she returned with several other COs, and the shackles were fastened around Fuentes' legs. Sergeant Brown, a supervising CO, did not enter Fuentes' cell, but he did hear Fuentes yelling at Kleeman and Konemann. Donato told Brown that Konemann and Kleeman had been

stripping Fuentes' cell when Fuentes swung at Konemann. Brown then left to obtain permission to place Fuentes in a restraint chair. Permission was granted by Assistant

_____

5. Cell stripping is a procedure which may be used when an inmate is causing a disturbance. It consists of removing from the cell all items except the clothes on the inmate's back, his legal papers and his toothbrush. For the first violation, the cell is stripped for 24 hours. For

each subsequent infraction, an additional 24 hours is added.

4

Warden, who authorized use of the restraint chair for eight hours. Fuentes' civil rights claim is based upon the use of that restraint chair and his allegation that Konemann and Kleeman used excessive force during the initial confrontation in his cell.6

Fuentes was no longer physically resisting when Brown returned with permission to use the restraint chair. However, Kleeman and Konemann were still holding Fuentes down, and Fuentes was threatening to "get" Konemann. Fuentes was then carried from his cell to a nearby cell where he was placed in the restraint chair. He did not resist physically being placed in the chair, though he did not cooperate.

With regard to the initial confrontation in Fuentes' cell, Fuentes alleged that Konemann and Kleeman threw him to the floor and beat him, and that Kleeman smeared his hand all over Fuentes' face. Fuentes denied trying to strike Konemann or threatening him. Fuentes insisted that he only asked Kleeman and Konemann why they were hitting him, and he claimed to have remained still from the time he was beaten until the time he was placed in the restraint chair. Kleeman admitted that Fuentes was no longer a threat to himself or anyone else once his hands were cuffed and his legs shackled. From the time Fuentes was removed from his cell to the time he was placed in the restraint chair, he was neither resisting nor physically combative. Fuentes was not given an opportunity to explain or defend any of his actions prior to being placed in the chair.

_____

6. The restraint chair at Berks County Prison is the "Pro-straint Violent Prisoner Chair." The back of the chair is angled back at a 45#DE# angle. An

inmate is placed in the chair with his arms handcuffed behind his back and his legs shackled. A restraint belt is fastened across the inmate's

lap, and two more restraint belts are placed across his chest while another restraint belt secures his ankles. At Berks County Prison, it is standard operating procedure to shackle an inmate's legs, as well as cuffing his wrists. The handcuffs that are used are double-locked so they cannot loosen or tighten more than when initially set. The prison has three restraint chairs, and they are on wheels so that they can be moved between housing units. They are used in the female unit, the disciplinary unit and the mental health unit. The chairs are not used on general population inmates.

Fuentes' confinement in the restraint chair was consistent with the institution's policy. COs checked him at fifteen minute intervals and he was released every two hours for a ten minute period of stretching, exercise, and use of the toilet. In addition, he was given a meal and seen by the medical staff at the end of the first two hour interval. The parties disputed whether Fuentes made any verbal threats during his first release period. Fuentes denied doing so, however, Konemann said that Fuentes was still threatening him and saying that he would "get" Konemann when he got out on the street.

During the second release period, which came at the end of four hours, Fuentes told Konemann "he wasn't going to get away with it, that [Fuentes] was going to see him sooner or later . . . ." Konemann interpreted this as a threat. However, Fuentes claimed that he only meant that he was going to sue Konemann.

When the third release period arrived, Fuentes had stopped making threats. He was finally released at the end of eight hours and examined by a staff nurse, as dictated by policy. She noted that Fuentes complained of pain in his right lower rib cage, but she observed no injuries with the exception of small bruises or swelling on both wrists.

On December 29, 1995, Fuentes was brought before the prison disciplinary board for a hearing on charges of assault/fighting/horseplay, threats, refusal of orders, and disturbance. He was given an opportunity to make a statement. The assault charge was dismissed but the board found him guilty of threats, refusal of orders and disturbance. Sanctions in the form of loss of all earned time credit and thirty days segregation were imposed.

Fuentes claimed that being in the restraint chair for eight hours resulted in loss of feeling in his hands and feet, cuts on his wrists and ankles where he had been handcuffed and shackled, leg cramps, discomfort in his arms, restricted breathing, and back pain.

II. DISCUSSION

Fuentes argues that the Magistrate Judge erred by: (1) denying his motion for judgment as a matter of law on his

procedural due process claim; (2) granting summary judgment in favor of the defendants on his substantive due process claim; and (3) instructing the jury improperly on his excessive force claim.

A. The Procedural Due Process Claim.

Fuentes alleged that his eight hour confinement in the restraint chair violated the Fourteenth Amendment of the United States Constitution. The Magistrate Judge denied cross-motions for summary judgment on the procedural due process claim after finding that "the evidence demonstrates a genuine issue of material fact as to whether Mr. Fuentes was placed in the restraint chair for punitive reasons or security reasons. . . ." Op. at 15. After the jury found against him on his procedural due process claim, Fuentes moved for judgment as a matter of law. However, the Magistrate Judge denied that motion. Fuentes claims that was error.

We exercise plenary review over the denial of a motion for judgment as a matter of law, and we apply the same standard that the District Court should have used. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). A motion for judgment as a matter of law "should be granted only if, viewing the evidence in the light most favorable to the nonmovant . . . there is insufficient evidence from which a jury could reasonably find[for the nonmovant]. [We] may not weigh the evidence. . . The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." Id . A jury must resolve any factual conflicts, not a court. Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802, 811 (3d Cir. 1985).

When Fuentes was placed in the restraint chair he was a convicted inmate awaiting sentencing. His status under the Constitution was therefore that of a pretrial detainee.7 In

_____

7. Before the Magistrate Judge, the defendants conceded that for purposes of his S 1983 claim, Fuentes was to be regarded as a pretrial

Cobb v. Aytch, 643 F.2d 946, 962 (3d Cir. 1981), we clarified the legal status of convicted, but unsentenced, inmates. We stated:

> The trial judge, in fashioning relief, drew a distinction between pretrial detainees and convicted but unsentenced inmates. He concluded that `the conviction alone appears to extinguish any `liberty' interest formally derived from the fourteenth amendment.' We disagree. The right to remain at liberty continues until a court pronounces a judgment of sentence, although after a jury has pronounced a guilty verdict the court may insist upon greater assurance that a defendant will submit to sentence.

(emphasis added). Given Fuentes' status as a pretrial detainee under the Fourteenth Amendment, he has

> federally protected liberty interests that are different in kind from those of sentenced inmates. Unlike sentenced prisoners, who . . . must look to state law for the protection of their personal liberties, pre-trial detainees have liberty interests firmly grounded in federal constitutional law.

Id. at 957.8

Our analysis of Fuentes' procedural due process claim is governed by Bell v. Wolfish, 441 U. S. 520 (1979).9 There, the Supreme Court wrote:

_____

detainee. Op. at 9 n.17. In this appeal, the defendants argue that Fuentes' status is the same as a sentenced inmate. See Appellees' Br. at 13, 20. We reject that argument because it contravenes the concession made before the Magistrate Judge, and because it is simply wrong. See Bell v. Wolfish, 441 U.S. 520, 538 (1979).

8. Fuentes' liberty interests are grounded in the Fourteenth Amendment because his allegations are against state actors as he was confined in a county prison.

9. The defendants, although discussing Bell v. Wolfish, rely, in part, on Sandin v. Conner, 515 U. S. 472 (1995), in support of their argument that Fuentes was not punished without due process of law. In Sandin, the Court held that liberty interests protected by the Due Process Clause "will be generally limited to freedom from restraint which, while not

8

> [I]n evaluating the constitutionality of conditions or

> restrictions of pretrial detention that implicate only the
> protection against deprivation of liberty without due
> process of law, we think the proper inquiry is whether
> those conditions amount to punishment of the
> detainee.

Id. at 535. "[A] detainee may not be punished prior to an
adjudication of guilt in accordance with due process of
law." Id. However, "[o]nce the Government has exercised its
conceded authority to detain a person pending trial, it
obviously is entitled to employ devices that are calculated
to effectuate this detention." Id. at 537. Thus, "[r]estraints
that are reasonably related to the institution's interest in
maintaining jail security do not, without more, constitute
unconstitutional punishment, even if they are
discomforting. . . ." Id. at 540. Obviously, "ensuring
security and order at the institution is a permissible
nonpunitive objective, whether the facility houses pretrial
detainees, convicted inmates, or both." Id.  at 561.
Consequently, "whether . . . restrictions and practices
constitute punishment in the constitutional sense depends
on whether they are rationally related to a legitimate
nonpunitive government purpose and whether they appear
excessive in relation to that purpose." Id.  Thus, there is a
"distinction between punitive measures that may not
constitutionally be imposed prior to a determination of guilt
and regulatory restraints that may." Id.

> [We] must decide whether the disability is imposed for
> the purpose of punishment or whether it is but an
> incident of some other legitimate governmental
> purpose. Absent a showing of an expressed intent to
> punish on the part of detention facility officials, that
> determination generally will turn on whether an
> alternative purpose to which [the restriction] may

_____

exceeding the sentence in such an unexpected manner as to give rise to
protection by the Due Process Clause in its own force, nonetheless
imposes atypical and significant hardship on the inmate in relation to
the ordinary incidents of prison life." 515 U. S. at 484. However, Sandin
does not apply here. Sandin concerned punishment of a sentenced
prisoner, and therefore required a completely different analysis.

9

> rationally be connected is assignable for it, and
> whether it appears excessive in relation to the
> 659alternative purpose assigned [to it]. Thus, if a

> particular condition or restriction of pretrial detention
> is reasonably related to a legitimate governmental
> objective, it does not, without more, amount to

`punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.

Id. at 538-39.

Fuentes has not clearly established that officials used the restraint chair as a means of "punishing" (as opposed to controlling) him. Accordingly, we must determine if this particular restriction, which may appear to be punitive, was really an incident of a legitimate nonpunitive objective. Id. at 539 n.20. "[A]bsent a showing of intent to punish, a court must determine if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective." Id. "Retribution and deterrence are not legitimate nonpunitive governmental objectives." Id.

Fuentes argues that "a reasonable jury could only have concluded that the defendants confined [him] in the restraint chair -- and kept him there for eight long hours -- to punish him." Appellant's Br. at 38-39. He therefore claims that the Magistrate Judge erred in denying his motion for judgment as a matter of law.

Clearly, there is evidence in this record from which a reasonable jury could conclude that use of the restraint chair was punishment. Sergeant Brown testified that the chair is used in the disciplinary unit for behavior modification purposes. Warden Wagner testified that the restraint chair is used to abate an inmate's behavior, and that it is used for behavior modification and control. Perhaps most significantly, he also testified that there is nothing the inmate can do to affect the amount of time he will remain in the chair once the inmate is placed in it.

10

However, there is also evidence from which a reasonable jury could conclude that Fuentes was placed in the restraint chair to quell a disturbance and restore the order and security of the institution. Kleeman testified that the restraint chair is used to handle an aggressive inmate who is causing harm to himself or others. Kleeman and Konemann both testified that Fuentes kicked his cell door and swung his handcuffed hands at Konemann's head. Konemann testified that although Fuentes was not physically aggressive when released from the chair during the first and second rest periods, Fuentes did continue to make threats.

Given this conflicting evidence, we disagree with Fuentes'
contention that a reasonable jury could only conclude that
use of the chair was punitive. The evidence was sufficient
to allow a jury to conclude that he was placed in the
restraint chair to stop his disruptive behavior and maintain
prison order and security. Accordingly, the Magistrate
Judge did not err in denying Fuentes' motion for judgment
as a matter of law. "Conflicting evidence which could
reasonably lead to inconsistent conclusions will not justify"
a judgment as a matter of law. Fireman's Fund Ins. Co. v.
Videfreeze Corp., 540 F.2d 1171, 1178 (3d Cir. 1976). "It is
the function of the trier of fact alone, the jury in this
instance, to evaluate the evidence and to draw inferences
therefrom." Id.

B. The Substantive Due Process Claim.10

Fuentes alleged that the use of the restraint chair
violated his substantive due process rights under the
Fourteenth Amendment, and constituted cruel and unusual
punishment under the Eighth Amendment as a matter of
law. However, the basis of his claim is elusive. The
Magistrate Judge concluded that Fuentes was claiming that
the use of the restraint chair is unconstitutional under any
circumstances under the Eighth Amendment. See  Op. at 15

_____

10. We exercise plenary review over the grant or denial of a motion for
summary judgment, applying the same standard that the district court
should have used in the first instance. Olson v. General Elec. Aerospace,
101 F.3d 947, 951 (3d Cir. 1996).

("[Fuentes] contends that the use of the restraint chair as
a means of corporal punishment is `cruel and unusual' and
violates the Eighth Amendment."). However, in his brief to
us, Fuentes conflates his substantive due process claim
into his procedural due process claim by arguing that the
central issue with respect to both is whether the use of the
chair constituted punishment. The appellees describe
Fuentes argument before us as follows:

> [Fuentes] appears to now contend that the district
> court should have considered only whether [he] was
> punished, not whether the alleged punishment was
> cruel and unusual. [Thus, Fuentes'] argument with
> respect to the district court's ruling on [the substantive
> due process claim] relating to claims of cruel and
> unusual punishment is confusing at best.

See Appellees' Br. at 9.

Fuentes argues that the Magistrate Judge incorrectly analyzed his substantive due process claim under the Eighth Amendment rather than under the Fourteenth Amendment. He correctly asserts that his claim is governed by the Fourteenth Amendment guarantee of due process, and not the Eighth Amendment's prohibition against cruel and unusual punishment because he had not been sentenced when the incident occurred.11  Under the Fourteenth Amendment, a pretrial detainee is entitled "at a minimum, [to] no less protection" than a sentenced inmate is entitled to under the Eighth Amendment. Colburn v. Upper Darby Township, 838 F.2d 663, 668 (3d Cir. 1988). Fuentes claims that "the district court never even considered the amount of additional substantive protection

_____

11. "The Cruel and Unusual Punishments Clause was designed to protect those convicted of crimes and consequently the Clause applies only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." Whitley v. Albers, 475 U. S. 312, 318 (1986)(citation and internal quotations omitted). Thus, its protections do not apply until "after conviction and sentence." Graham v. Connor, 490 U. S. 386, 392 n.6 (1989). The clause, and indeed the entire Eighth Amendment, is made applicable to the states through the Fourteenth Amendment. Robinson v. California, 370 U. S. 660 (1962).

12

to which [he] was entitled" under the Fourteenth Amendment by virtue of his status as a pretrial detainee. Appellant's Br. at 18-19.

In Kost v. Kozakiewicz, 1 F.3d 176, 188 n.10 (3d Cir. 1993), we noted that "pretrial detainees. . . are entitled to at least as much protection as convicted prisoners, so the protections of the Eighth Amendment would seem to establish a floor of sorts. It appears that no determination has as yet been made regarding how much more protection unconvicted prisoners should receive." Fuentes contends that, as an unsentenced inmate, he was entitled to be free from any punishment. However, that very issue was before the jury with respect to Fuentes' procedural due process claim, and, as we have indicated, the jury's determination in favor of the defendants on that issue was supported by sufficient evidence. Accordingly, even if the Magistrate Judge had applied a Fourteenth Amendment standard, Fuentes would not have prevailed at trial.

The Eighth Amendment protects against infliction of "cruel and unusual punishment." However, "not every governmental action affecting the interests or well-being of

a prisoner is subject to Eighth Amendment scrutiny."
Whitley v. Albers, 475 U. S. 312, 319 (1986)."After
incarceration, only the unnecessary and wanton infliction
of pain constitutes cruel and unusual punishment
forbidden by the Eighth Amendment." Id. (citation and
internal quotations omitted). "It is obduracy and
wantonness, not inadvertence or error in good faith, that
characterize the conduct prohibited by the Cruel and
Unusual Punishments Clause, whether that conduct occurs
in connection with establishing conditions of confinement,
supplying medical needs, or restoring official control over a
tumultuous cellblock." Id.

Resolution of an Eighth Amendment claim therefore
"mandate[s] an inquiry into a prison official's state of
mind." Wilson v. Seiter, 501 U. S. 294, 299 (1991). Two
considerations define that inquiry. We must first determine
if the deprivation was sufficiently serious to fall within the
Eighth Amendment's zone of protections. Id. at 298. If not,
our inquiry is at an end. However, if the deprivation is
sufficiently serious, we must determine if the officials acted

13

with a sufficiently culpable state of mind. Id . In other
words, we must determine if they were motivated by a
desire to inflict unnecessary and wanton pain."What is
necessary to establish an `unnecessary and wanton
infliction of pain'. . . varies according to the nature of the
alleged constitutional violation." Hudson v. McMillian, 503
U. S. 1, 5 (1992).

When excessive force is alleged in the context of a prison
disturbance, the subjective inquiry is "whether force was
applied in a good-faith effort to maintain or restore
discipline, or maliciously and sadistically to cause harm."
Id. at 7. The objective inquiry is whether the inmate's injury
was more than de minimis. Id. at 9-10.

When an Eighth Amendment claim arises in the context
of a challenge to conditions of confinement, we must
determine if prison officials acted with "deliberate
indifference" to the inmate's health. Farmer v. Brennan, 511
U. S. 825, 837 (1994).12 The objective inquiry is whether the
inmate was "denied the minimal civilized measure of life's
necessities." Hudson, 503 U. S. at 9.

Fuentes contends that his substantive due process claim
does not neatly fit into either the "excessive force" category
or the "conditions of confinement" category. Nonetheless, he
argues, not only that the Magistrate Judge erred by
granting summary judgment to the prison officials on his
hybrid substantive due process claim, but also that he

should have been granted summary judgment on that claim. He argues in the alternative that the claim should at least have been submitted to the jury. We disagree.

_____

12. In Farmer v. Brennan, the Court finally defined "deliberate indifference," which first appeared in Estelle v. Gamble, 429 U. S. 97, 104 (1976). The Court required a showing that the prison official was "subjectively aware of the risk." 511 U. S. at 829. It wrote: "We hold . . . that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

14

Fuentes' due process claim is limited to use of the restraint chair. It does not encompass the force initially used to subdue him, or to place him in the chair. Accordingly, whether analyzed as an excessive force claim or a conditions of confinement claim, Fuentes had to demonstrate that the prison officials had a "sufficiently culpable state of mind," to establish that use of the restraint violated the Eighth Amendment. It is obvious that prison officials were not "deliberately indifferent" to his health or well-being in employing the restraint chair, and a conditions of confinement analysis therefore requires little discussion.

It is undisputed that the prison policy for the use of the restraint chair was followed here. Accordingly, Fuentes was not kept in the chair any longer than had been authorized, his physical condition was checked every 15 minutes, and he was released every two hours for 10 minutes to allow stretching, exercise, and use of the toilet. He was given food, and he was examined by a nurse at the end of the eight hour confinement.13

Moreover, even if we assume that the injuries Fuentes alleges were sufficiently serious to establish an Eighth Amendment violation, there is no evidence that prison officials placed him in the chair "maliciously and sadistically to cause harm." Fuentes argues that the prison officials' conduct was malicious and sadistic because (1) there was no need to use the restraint chair; (2) the restraint chair was much too severe a response under the circumstances; (3) the prison officials did not perceive him as an immediate threat when they placed him in the chair; and (4) the prison officials made no effort to temper the severity of their response even though it was clear that he posed no threat to institutional security. Appellant's Br. at

30. However, even if we concede each of these assertions, Fuentes has established at most that prison officials over-reacted to the disturbance that he caused. Given the totality of the circumstances surrounding use of the

_____

13. These same factors that establish that the prison officials were not deliberately indifferent also establish that Fuentes was not "denied the minimal civilized measure of life's necessities."

15

restraint chair here, any such over-reaction would still fall short of supporting a finding that prison officials acted "maliciously and sadistically to cause harm."

Consequently, the Magistrate Judge did not err by granting summary judgment in favor of the defendants on Fuentes' substantive due process claim.

C. The Jury Instructions on Excessive Force. 14

Fuentes alleged that Konemann and Kleeman used excessive force in violation of the Fourteenth Amendment. Fuentes also alleged that Donato was liable because she observed the use of excessive force and failed to intervene with respect to the initial confrontation in his cell. Over Fuentes' objection, the Magistrate Judge charged the jury on excessive force as follows:

> [P]laintiff must show by a preponderance of the evidence, that one or more of the defendants inflicted unnecessary and wanton pain and suffering. You must decide whether the force applied was in a good faith effort to maintain or restore discipline, in which case, you must find that the defendants did not use excessive force, or whether the force applies (sic) was inspired by an unwise, excessive zeal, amounting to an abuse of official power, that shocks the conscience, in which case, you must find that one or more of the defendants did use excessive force.

Fuentes argues that this charge "compelled [him] to meet a much higher burden than an unsentenced inmate is required to meet in order to prove an excessive force claim." Appellant's Br. at 47. He argues that the "objective reasonableness" instruction he proposed should have been given to the jury instead.15

_____

14. We exercise plenary review in determining whether jury instructions misstated an applicable legal standard. Parks v. AlliedSignal, Inc., 113 F.3d 1327, 1330 (3d Cir.1997).

15. Fuentes' proposed excessive force jury instruction reads:

> In order to prove that the defendants used excessive and unnecessary force, the plaintiff must prove by a preponderance of

However, Fuentes was not entitled to an "objective reasonableness" instruction. The "objective reasonableness" test has its constitutional foundation in the Fourth Amendment and is properly applied in excessive force claims arising from investigatory stops and/or arrests. Graham v. Connor, 490 U. S. 386 (1989). The Court in Graham specifically stated:

> Our cases have not resolved the question of whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today. It is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.

490 U. S. at 395 n.10 (citations omitted)(emphasis added).

Our conclusion that Fuentes was not entitled to an "objective reasonableness" instruction does not, however, completely meet Fuentes' claim of error. Fuentes' essential point is that the instruction given to the jury was an Eighth Amendment excessive force instruction applicable to sentenced inmates and inapplicable to him. He argues that his excessive force claim should have been analyzed under the Bell v. Wolfish "conditions of confinement" standard because he was a pretrial detainee. He insists that he was not required to prove that he experienced "wanton pain and suffering" or to establish that the application of force upon him "was inspired by an unwise, excessive zeal, amounting

_____

> the evidence: (1) that the plaintiff suffered some harm, (2) that the harm resulted directly from the use of force that was clearly excessive in relation to any need for the use of force, and (3) that the excessiveness of the force was objectively unreasonable in light of the facts and circumstances at the time.
>
> Some of the factors you may consider in determining whether the defendants used excessive force are: (1) the extent of the injury suffered, (2) the need for the use of force, (3) the relationship

between that need and the amount of force used, (4) the threat reasonably perceived by the prison guards involved; and (5) any efforts made to temper the severity of the forceful response.

17

to an abuse of official power" or to prove that the conduct of Konemann, Kleeman and Donato "shocked the conscience."

However, we agree with the contrary analysis in Valencia v. Wiggins, 981 F.2d 1440 (5th Cir. 1993). There, the court also addressed a pretrial detainee's excessive force claim against a prison guard. The claim arose from a prison disturbance. The court initially looked to Bell v. Wolfish for guidance in determining the standards to be applied. However, it found that Bell, while working"well for claims of improper conditions or restrictions, . . . does not lend itself to analysis of claims of excessive force in controlling prison disturbances." Id. at 1446. The court reasoned:

> In Bell, the Court stated that the government must be able to take steps to maintain security and that "[r]estraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment . . . ." Bell further noted that there is no reason to distinguish between pretrial detainees and convicted inmates in reviewing challenged security practices because there is no basis to conclude that pretrial detainees pose any lesser security risk than convicted inmates.

> For these reasons, we conclude that excessive use of force claims by pretrial detainees should not be analyzed under Bell's conditions of confinement standard. Instead, we are guided by the standard announced in Whitley and Hudson. While these cases specifically addressed claims of excessive use of force brought by convicted prisoners, it is impractical to draw a line between convicted prisoners and pretrial detainees for the purpose of maintaining jail security. Moreover, the Court indicated in Hudson that many of its concerns in Whitley were not limited to Eighth Amendment claims but "arise whenever guards use force to keep order." It further observed that claims based on excessive force and claims based on conditions of confinement are different in kind.

> Therefore, when a court is called upon to examine the amount of force used on a pretrial detainee for the

18

> purpose of institutional security, the appropriate
> analysis is that announced in Whitley and Hudson:
> whether the measure taken inflicted unnecessary and
> wanton pain and suffering depends on "whether force
> was applied in a good faith effort to maintain or restore
> discipline, or maliciously and sadistically for the very
> purpose of causing harm."

Id. Accordingly, we hold that the Eighth Amendment cruel and unusual punishments standards found in Whitley v. Albers, 475 U. S. 312 (1986) and Hudson v. McMillian, 503 U. S. 1 (1992), apply to a pretrial detainee's excessive force claim arising in the context of a prison disturbance. We can draw no logical or practical distinction between a prison disturbance involving pretrial detainees, convicted but unsentenced inmates, or sentenced inmates. Nor can prison guards be expected to draw such precise distinctions between classes of inmates when those guards are trying to stop a prison disturbance.

Consequently, Fuentes' objections to having to prove "wanton pain and suffering" and "an unwise excessive zeal, amounting to an abuse of official power," were properly overruled. We are not troubled by the court's instruction requiring Fuentes to establish that the challenged force was motivated by a desire to inflict "wanton pain and suffering." That requirement is nothing more than a restatement of the requirement that Fuentes establish that the force was "inspired by an unwise, excessive zeal, amounting to an abuse of official power." That requirement in turn amounts to nothing more than the application of force "maliciously and sadistically for the very purpose of causing harm."

However, Fuentes' objection to having to prove that the prison guards' conduct "shocked the conscience," as required by the instruction, is somewhat more troublesome. Although "shocks the conscience" is a term of art in Fourteenth Amendment substantive due process jurisprudence, see Rochin v. California, 342 U. S. 165, 172–73 (1952), our recent decisions suggest that the standard may only apply to police pursuit cases. See Fagan v. City of Vineland, 22 F.3d. 1296, 1306 (3d Cir. 1994); see also Kneipp v. Tedder, 95 F.3d 1199, 1207–08 (3d Cir. 1996) ("We believe that the Fagan II shocks the conscience

19

standard is limited to police pursuit cases. . . ."). Furthermore, in Valencia v. Wiggins, supra, the court rejected the contention that a pretrial detainee bringing an excessive force claim arising from a prison disturbance had

to demonstrate that the prison guards' conduct "shocked the conscience."

Nonetheless, we believe that, in light of the Supreme Court's decision in County of Sacramento v. Lewis, ___ U. S. ___, 118 S. Ct. 1708 (1998), the "shocks the conscience" standard is not inappropriate to an excessive force claim in the context of a prison disturbance. Lewis involved a high speed police chase of a motorcycle that ended in the death of the passenger of the fleeing motorcycle. The parents of the decedent sued under 42 U.S.C. S 1983 alleging that the police conduct violated the constitutional rights of the decedent. The Court's analysis of the police conduct clarifies that the "shocks the conscience" standard of culpability applies in those instances where the police officer must instantaneously respond to a situation without opportunity for reflection on his or her actions. 118 S. Ct. at 1721.

In concluding that the "shocks the conscience" standard applies to police pursuit cases, the Court analogized the police officers' situation in a pursuit case to that of prison officials who have to immediately respond to a violent prison disturbance to restore and to maintain order and security. Id. at 1720 ("The analogy to sudden police chases (under the Due Process Clause) would be hard to avoid.").

Moreover, in Hudson v. McMillian, the Court noted that:

> the officials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force. . . . Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need to maintain or restore discipline through force against the risk of injury to inmates. Both situations may require prison officials to act quickly and decisively. Likewise, both implicate the principle that [p]rison administrators . . . should be accorded wide-ranging deference in the

20

> adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. In recognition of these similarities, we hold that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.

Hudson, 503 U.S. at 6-7 (citations and internal quotation marks omitted).

Here, Kleeman, Konemann and Donato were faced with Fuentes' disruptive and violent behavior for which they were not to blame. They could not take time to reason through various options to determine the most appropriate response. Rather, they had to quickly respond in order to quell the disturbance Fuentes was creating, and minimize the possibility of an escalating disruption inside the prison. Under those circumstances, we believe that the "shocks the conscience" test that the Supreme Court has utilized in analogous situations, including high speed chases, is the appropriate gauge of the conduct. Accordingly, wefind no error in the Magistrate Judge's jury instruction.

III. CONCLUSION.

For all of the reasons set forth above, we will affirm.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

21