**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4468
_____

NATHANIEL L. JACKSON

v.

PERRY PHELPS; MICHAEL TRADER; STEVEN FLOYD; MIGUEL FIGUEROA,
formerly known as Michael Figueroa; VINCENT LEWIS; KEITH BURNS; BRANDON
RICHARDSON; MARK DAUM, formerly known as Mark Damu; JESSE MARTIN;
PAUL GAUTHIER; CORRECTIONAL OFFICER  ENDICOTT

PERRY PHELPS; MICHAEL TRADER; STEVEN FLOYD; MIGUEL FIGUEROA,
formerly known as Michael Figueroa;
VINCENT LEWIS; KEITH BURNS; BRANDON RICHARDSON; MARK DAUM,
formerly known as Mark Damu;
PAUL GAUTHIER; CORRECTIONAL OFFICER  ENDICOTT,
                                                                                        Appellants
_____

On Appeal from the United States District Court
for the District of Delaware
(No. 1-10-cv-00919)
District Judge:  Honorable Sue L. Robinson
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
July 8, 2014
_____

Before:  RENDELL, CHAGARES, and JORDAN, Circuit Judges.

(Filed: August 7, 2014)

_____

OPINION
_____

CHAGARES, Circuit Judge.

Nathaniel Jackson, a pretrial detainee, filed a lawsuit against numerous Delaware correctional employees[1] under 42 U.S.C. § 1983. The defendants seek interlocutory review of the District Court's denial of their motion for summary judgment based on qualified immunity. For the following reasons, we will affirm.

I.

We write solely for the parties and will therefore recount only those facts that are essential to our disposition. Jackson's claims arise from an incident that occurred on March 18, 2010 while he was housed in the Security Housing Unit ("SHU") at the James T. Vaughn Correctional Center ("JTVCC") in Smyrna, Delaware. The SHU was on lockdown due to an unrelated disturbance, and the inmates were given bag lunches in their cells. Jackson, who was housed in Building 18, attempted to flush trash from his lunch bag down the toilet, causing it to overflow. Lewis and Burns handcuffed Jackson and escorted him to SHU Building 17. They were met by Trader, who informed Jackson that he would be placed in twenty-four-hour restraints for flooding his cell. Prison policy provides that an inmate who "spit[s] on and/or throw[s] objects at staff" may be

---

[1] Jackson's complaint initially named seventeen defendants, but only nine remain at this stage in the litigation: Warden Perry Phelps; Lieutenant Michael Trader; and correctional officers Steven Floyd, Miguel Figueroa, Vincent Lewis, Keith Burns, Brandon Richardson, Paul Gauthier, and Sean Endicott (collectively, the "defendants").

restrained for twenty-four hours to "allow the inmate to regain his composure." Joint Appendix ("App.") 169.

Jackson was taken to an observation room, where he was directed to remove all of his clothing except for his underwear, face the wall, and kneel. Trader, Lewis, Burns, and Richardson placed full restraints on Jackson, which included handcuffs secured to a waist chain, foot shackles, and a black box with a padlock that bound his wrists together. Jackson did not resist, but, once he was restrained, he complained that the handcuffs were too tight. A nurse entered the room to check the cuffs and reported that they were adequately loose. Jackson continued to complain about the handcuffs, attempting to get the attention of another prison employee by kicking and shaking the door.[2] The defendants entered the room to place a foam rubber helmet on Jackson's head. Jackson resisted their efforts, whereupon several officers, including Richardson, Figueroa, Floyd, and Gauthier, wrestled him to the floor and put the helmet on him.

After Jackson was again left alone in the room, he nudged the helmet off and recommenced banging on the door. Lewis and Burns returned and told Jackson to face the wall and kneel. After he complied, Lewis, Burns, Richardson, Figueroa, Floyd, and Endicott tackled Jackson and pulled his underwear down. A nurse entered the room carrying a needle and injected each of Jackson's buttocks with antipsychotic and sedative medications. Jackson was left in the room with his boxers down, and he eventually fell asleep on a foam mattress.

---

[2] The parties dispute whether Jackson was also banging his head against the door and walls.

The next morning, Jackson could not eat breakfast but ate lunch without using his hands. When Jackson's restraint period ended at approximately 5:30 p.m. on March 19, 2010, Richardson and another officer removed the restraints and escorted Jackson back to his cell. Jackson was barefoot and clothed only in his underwear.

Jackson filed a grievance related to the March 2010 incident on September 5, 2010, asking that the defendants' actions be "investigated." App. 184. The grievance was returned as nongrievable, App. 167, on the basis that "[r]equests are not processed through the grievance procedure," App. 185. Jackson was instructed to communicate directly with the "appropriate" office to secure the information he requested, namely, with security and medical staff. Id. Jackson reiterated his complaints in a September 23, 2010 letter to Phelps, App. 168, who apparently initiated an investigation into the matter, see App. 293–95.

This lawsuit followed. In his third amended complaint, filed on December 14, 2012, Jackson averred that: (1) Phelps and Trader, in their supervisory capacities, violated his right to procedural due process by failing to provide a means by which he could contest the use of the twenty-four-hour restraints (Count One); and (2) all but one of the nine defendants (Phelps) personally violated his due process rights through their use of excessive force against him (Count Two). Counts Three and Four alleged state-law claims for battery and intentional infliction of emotional distress, respectively. The defendants moved for summary judgment on several grounds, including qualified immunity. The District Court denied their motion on November 15, 2013, and the defendants timely appealed.

4

II.

The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1331. Because the District Court's decision was based on a legal issue rather than sufficiency of the evidence, we have jurisdiction over the defendants' appeal under 28 U.S.C. § 1291. See Ashcroft v. Iqbal, 556 U.S. 662, 672 (2009); Bistrian v. Levi, 696 F.3d 352, 364 (3d Cir. 2012). "We exercise plenary review of orders rejecting qualified immunity at the summary judgment stage." Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). "We apply the same standard that district courts apply at summary judgment." Id. Thus, we draw all reasonable inferences in favor of the non-moving party, Curley v. Klem, 298 F.3d 271, 276–77 (3d Cir. 2002), and we will reverse a denial of summary judgment only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

III.

Jackson principally claims that the defendants' use of twenty-four-hour restraints, a foam helmet, and antipsychotic medication constituted excessive force, causing him to suffer imprints and welts on his wrists, scratches on his head, and mental and emotional distress.[3] The defendants counter that the above-listed conduct "simply cannot be

---

[3] Jackson also contends that the defendants' arguments as to qualified immunity "cannot be considered" because they were not properly preserved. See Jackson Br. 25–29. We disagree. To preserve an issue for appeal, a party must present it to the district court with some "minimum level of thoroughness." In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 262 (3d Cir. 2009). The defendants' briefs in support of their summary judgment motions, while not detailed, expressly raised the affirmative defense of qualified immunity. App. 117–18; see App. 96; see also App. 128. We believe that this was sufficient to preserve the issue for appeal.

characterized as violative of a clearly established constitutional right." Defendants' Br. 12.

Officials benefit from qualified immunity unless their conduct violates clearly established law. Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011). In determining whether a right was clearly established, we "must consider the state of the existing law at the time of the alleged violation and the circumstances . . . to determine whether a reasonable state actor could have believed his conduct was lawful." Kelly v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 131 S. Ct. at 2083. "[T]he plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right." Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997). "The status of the right as clearly established and the reasonableness of the official conduct are questions of law." Sterling v. Borough of Minersville, 232 F.3d 190, 193 (3d Cir. 2000).

Because the Supreme Court has "reject[ed] th[e] notion that all excessive force claims brought under § 1983 are governed by a single generic standard," Graham v. Connor, 490 U.S. 386, 393 (1989), we must initially determine what standard applies here: the due process standard generally applicable to pretrial detainees, see Bell v. Wolfish, 441 U.S. 520, 535 (1979), or the Eighth Amendment standard generally applicable to sentenced inmates, id. at 535 n.16.[4] The distinction is significant because,

---

[4] The Eighth Amendment is made applicable to the states through the Fourteenth Amendment. Robinson v. California, 370 U.S. 660, 675 (1962).

6

whereas the Due Process Clause prohibits any form of punishment, the Eighth Amendment only prohibits punishment that is "cruel and unusual," id., namely, punishment imposed "maliciously and sadistically to cause harm," Hudson v. McMillian, 503 U.S. 1, 7 (1992).

There is no dispute that Jackson's status was that of a pretrial detainee. The defendants nevertheless suggest that the more demanding Eighth Amendment standard should be applied here, on the ground that their actions were undertaken "in response to prison disturbances created by Mr. Jackson." See Defendants' Br. 12–13, 21–22. We have held that the Eighth Amendment standard applies to a pretrial detainee's excessive-force claim that "arises" in the context of a prison disturbance, reasoning that prison guards cannot be expected to draw distinctions between sentenced and unsentenced inmates when institutional security is in jeopardy. See Fuentes v. Wagner, 206 F.3d 335, 347–48 (3d Cir. 2000). As the District Court observed, however, the purportedly unlawful actions in this case occurred when Jackson was isolated in an observation room in a building separate from his cell where the flooding occurred. Moreover, the administration of a foam helmet and medication occurred when Jackson was effectively immobilized in full restraints. There is no evidence that Jackson could have incited a prison riot or other widespread disruption under these circumstances, let alone that he did. Cf. id. at 339, 349. We therefore agree with the District Court that Jackson's claim is most properly characterized as one invoking the protections of the Fourteenth Amendment's Due Process Clause.

7

We now turn to application of that standard. "It is clear . . . that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." Graham, 490 U.S. at 395 n.10 (citing Wolfish, 441 U.S. at 535–39). Whether force constitutes "punishment" depends on whether it is "rationally related to a legitimate nonpunitive governmental purpose" and whether it "appear[s] excessive in relation to that purpose." Wolfish, 441 U.S. at 561. "Absent proof of intent to punish . . . this determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Block v. Rutherford, 468 U.S. 576, 584 (1984) (quotation marks omitted). We "ordinarily defer to [the] expert judgment" of prison officials, unless there is "substantial evidence in the record to indicate that the officials have exaggerated their response" to the governmental interest in maintaining security and order. Wolfish, 441 U.S. at 540 n.23 (quotation marks omitted).

The defendants insist that their challenged actions "were concerned primarily with maintaining security and ensuring that Mr. Jackson and prison staff were protected." Reply Br. 15. For instance, the defendants contend that the restraints were necessary to preserve prison security, as "[f]looding cells in a prison setting can destroy prison property and undermine the orderly administration of the prison." Reply Br. 10. According to the defendants, the decision to forcibly medicate Jackson arose from his "erratic behavior" (banging on the door). Reply Br. 13.

"In evaluating a pretrial detainee's claim of unconstitutional punishment, courts must examine the totality of the circumstances within the institution." Bistrian, 696 F.3d

8

at 373 (quotation marks omitted). Examining all of the facts in the light most favorable to Jackson, we cannot conclude that the defendants are entitled to qualified immunity as a matter of law. Of course, "[r]estraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment." Wolfish, 441 U.S. at 540. But the undisputed facts are that, after the toilet overflowed, Jackson was handcuffed and taken to a separate building, where he was placed alone in an observation room. Although Jackson tried to explain that he did not intend for the flooding to occur, and despite that he was cooperative at the time, the decision was made to place him in full restraints — that is, handcuffs secured to a waist chain, foot shackles, and a black box with a padlock that bound his wrists together — for twenty-four consecutive hours. He was then forcibly medicated. Even assuming that the restraints were rationally related to protecting institutional security, and Jackson's behavior was "erratic," a reasonable jury could conclude that, under a totality of the circumstances, both actions were disproportionately severe such as to amount to punishment. See Wolfish, 441 U.S. at 539 n.20 ("Retribution and deterrence are not legitimate nonpunitive governmental objectives.").[5]

In summary, at this juncture in the litigation, we decline to hold that the challenged actions were utilized as a means of controlling Jackson (which is constitutionally permissible) as opposed to punishing him (which is not). We will

---

[5] The defendants further assert that the foam helmet "was used out of an abundance of caution to ensure Mr. Jackson was protected from himself." Defendants' Br. 18; Reply Br. 12–13. But the parties dispute whether Jackson was also banging his head against the door and walls, and we are bound to construe this discrepancy in Jackson's favor. See Sterling, 232 F.3d at 192 n.1.

9

therefore affirm the District Court's order denying summary judgment on the basis of

qualified immunity.[6]

IV.

For the foregoing reasons, we will affirm.

---

[6] Count One of the third amended complaint alleged a supervisory liability claim against Phelps and Trader. The defendants' opening brief does not challenge the denial of qualified immunity as to this claim. They have thus waived the argument. See Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief.").