PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3629
_____

PETER BISTRIAN

v.

WARDEN TROY LEVI, FDC Philadelphia; ASSISTANT
WARDEN TRACY BROWN, FDC Philadelphia;
ASSISTANT WARDEN BLACKMAN, FDC Philadelphia;
CAPTAIN DAVID C. KNOX, FDC Philadelphia; J.
MCLAUGHLIN, Special Investigative Agent, FDC
Philadelphia; DAVID GARRAWAY, Special Investigative
Agent, FDC Philadelphia; LT. J. A. GIBBS, FDC
Philadelphia; SENIOR WILLIAM JEZIOR, FDC
Philadelphia; SENIOR OFFICER BOWNS, FDC
Philadelphia; SENIOR OFFICER BERGOS, FDC
Philadelphia; UNIT MANAGER WHITE, FDC Philadelphia;
LT. RODGERS, FDC Philadelphia; LT. R. WILSON, FDC
Philadelphia; LT. ROBINSON, FDC Philadelphia; LT. D.
ACKER, FDC Philadelphia; LT. D. DEMPSEY, FDC
Philadelphia; LT. ARMISAK, FDC Philadelphia; CLINICAL
DIRECTOR O. DALMASI, M.D., FDC Philadelphia;
PHYSICIAN ASSISTANT H. BOKHARI, FDC
Philadelphia; PHYSICIAN ASSISTANT A. FAUSTO, MLP,
FDC Philadelphia; CHIEF PSYCHOLOGIST A.
BOARDMAN, FDC Philadelphia;

A. MARTINEZ, Health Service Administrator, FDC Philadelphia; G. REYNOLDS, M.D. FDC Philadelphia; K. KAISER, PA-C, FDC Philadelphia; Q. HIT ALSBROOKS, FDC Philadelphia; A. ZORRILLA, NP, FDC Philadelphia; D. MASSA, M.D., FDC Philadelphia; D. STILL, DDS, CDO, FDC Philadelphia; JOHN/JANE DOES 1-10, Agents Servants, and Employees of Federal Bureau of Prisons and/or Federal Detention Center, Philadelphia; JOHN/JANE DOES 11-15, Agents, Servants, and Employees of other Departments, Agencies, and/or Bureaus of the United States of America; THE UNITED STATES OF AMERICA

WARDEN TROY LEVI; ASSISTANT WARDEN TRACY BROWN; ASSISTANT WARDEN BLACKMAN; CAPTAIN DAVID C. KNOX; J. MCLAUGHLIN; DAVID GARRAWAY; LT. J. A. GIBBS; SENIOR WILLIAM JEZIOR; SENIOR OFFICER BOWNS; SENIOR OFFICER BERGOS; UNIT MANAGER WHITE; LT. RODGERS; LT. R. WILSON; LT. ROBINSON; LT. D. ACKER; LT. D. DEMPSEY; LT. ARMISAK; CLINICAL DIRECTOR O. DALMASI, M.D.; PHYSICIAN ASSISTANT H. BOKHARI; PHYSICIAN ASSISTANT A. FAUSTO; CHIEF PSYCHOLOGIST A. BOARDMAN; A. MARTINEZ; K. KAISER; Q. HIT ALSBROOKS; A. ZORRILLA; D. MASSA, M.D.; D. STILL

Appellants

2

_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-08-cv-03010)
District Judge:  Honorable Cynthia M. Rufe
_____

Argued March 7, 2012
_____

Before:  McKEE, Chief Judge, SCIRICA,
and AMBRO, Circuit Judges

(Opinion filed: September 24, 2012)

John P. Kahn, Esq. (**Argued**)
Archer & Greiner
One Centennial Square
P.O. Box 3000
Haddonfield, NJ   08033

Carlton L. Johnson, Esq.
Richard G. Tuttle, Esq.
Archer & Greiner
1650 Market Street
One Liberty Place, 32nd Floor
Philadelphia, PA   19103-7393

*Counsel for Appellants*

Jonathan S. Abady, Esq.
Adam R. Pulver, Esq.

O. Andrew F. Wilson, Esq. (**Argued**)
Emery, Celli, Brinckerhoff & Abady
75 Rockefeller Plaza, 20th Floor
New York, NY   10019

Stephanie B. Fineman, Esq.
Fox Rothschild
2700 Kelly Road, Suite 300
Warrington, PA   18976-3624

Robert E. Goldman, Esq.
P.O. Box 239
Fountainville, PA   18923

James L. Griffith, Esq.
Fox Rothschild
2000 Market Street, 20th Floor
Philadelphia, PA    19103

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

AMBRO, Circuit Judge

Twenty-seven employees of the Federal Detention Center in Philadelphia ("FDC Philadelphia") appeal the District Court's denial of their motion to dismiss Peter Bistrian's multiple claims. Bistrian asserts that, while he was awaiting sentencing on wire-fraud charges, prison investigators used him to intercept notes being passed among

other inmates, and then failed to protect him after they flubbed the operation and the inmates discovered his involvement. When the target inmates threatened to retaliate, Bistrian contends he repeatedly begged the officials responsible for help, but no one took any preventive measures. Later, one of the inmates against whom Bistrian had cooperated, along with two others, beat him while they were together in a locked recreation pen. A few months later, an inmate wielding a razor-blade type weapon also attacked Bistrian in the recreation pen. In addition, Bistrian claims that certain chunks of the 447 days he spent in administrative segregation violated his substantive due process, procedural due process, and free speech rights.

Bistrian's 108-page Second Amended Complaint (the "Complaint") includes 19 counts, 309 paragraphs, and an additional 114 pages of exhibits. After the District Court's ruling, six counts survived against 28 defendants. Though we pare down this action further as to both the number of defendants and claims, those that remain are plausible and can proceed past the motion-to-dismiss stage. Thus, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

## I.    Factual Background[1]

---

[1] When reviewing the denial of a Rule 12(b)(6) motion to dismiss, we must accept as true all well-pled factual allegations as well as all reasonable inferences that can be drawn from them, and construe those allegations in the light most favorable to the plaintiff. *See Mayer v. Belichick*, 605 F.3d 223, 229-30 (3d Cir. 2010). As such, we set out facts as they appear in the Complaint and its exhibits. *See id.* at 230

## A. Bistrian Enters the Special Housing Unit ("SHU") for the First Time

Bistrian was a detainee at FDC Philadelphia from August 2005 — when he was arrested on federal wire fraud-related charges — until his sentencing in March 2008. App. 74 ¶ 9; 186; 235. During that time he clocked four spells, totaling 477 non-consecutive days, in the Special Housing Unit ("SHU"). App. 81 ¶ 39.

The SHU is a segregated housing unit where inmates may be placed for either administrative or disciplinary reasons. App. 74-76 ¶¶ 11-17. Inmates are confined in solitary or near-solitary conditions in a six-by-eight foot cell "for 23 to 24 hours a day, with little or no opportunity to interact with other inmates." App. 75 ¶12. They face sensory deprivation, reduced access to medical care, and increased suicidal tendencies. App. 75 ¶¶ 12-13.

Administrative detention in the SHU can occur for a variety of reasons. App. 76 ¶¶ 18-27. If an "inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or the security or orderly running of the institution," then the Warden may place the inmate in administrative detention if (among other reasons) an investigation of an inmate is pending for violating prison regulations or the inmate requests admission for protective purposes. App. 76 ¶ 19 (quoting 28 C.F.R. § 541.22(a)).[2] Bureau of Prison ("BOP") regulations require

(noting that a court can consider "exhibits attached to the complaint" when deciding a Rule 12(b)(6) motion to dismiss).

[2] Some of the regulations that Bistrian quotes or cites in the Complaint (filed in July 2009) have since been amended. In

the Warden of a detention facility to prepare an administrative order "detailing the reasons for placing an inmate in administrative detention" within 24 hours of the inmate's placement, and to provide a copy to the inmate. App. 77 ¶ 20 (quoting 28 C.F.R. § 541.22(b)). In addition, a Segregation Review Officer ("SRO") must make ongoing determinations about the appropriateness of the inmate's continued housing in administrative detention. App. 77-78 ¶¶ 21-27.

Disciplinary segregation is principally reserved for inmates "officially designated as exhibiting violent or seriously disruptive behavior while incarcerated." App. 74-75 ¶ 11; 78-80 ¶¶ 28-37. Only a Discipline Hearing Officer ("DHO") may impose disciplinary segregation, and may do so only after a hearing finding the inmate has committed a serious prohibited act. App. 78-80 ¶¶ 29-37. An SRO must also monitor inmates in disciplinary segregation and make determinations about the appropriateness of their continued separation. App. 80 ¶ 36.

On November 18, 2005, Bistrian was transferred out of the general prison population and into administrative detention in the SHU because he supposedly abused his telephone privileges. App. 85 ¶ 57. On December 9, 2005, a DHO sanctioned him to 30 days' disciplinary segregation for the alleged infractions. App. 85 ¶¶ 59. Bistrian was released from the SHU on January 9, 2006. *Id.* The propriety of this 30-day disciplinary segregation is not at issue here.

According to the Complaint, Warden Troy Levi failed to prepare an administrative detention order detailing the

the background section of this opinion, we refer to and quote the regulations as they appear in the Complaint. Current federal regulations concerning SHUs appear in 28 C.F.R. §§ 541.20-.33.

7

reasons for Bistrian's detention and to provide him with a copy within 24 hours of his initial confinement on November 18. App. 85 ¶ 60. Bistrian also claims an SRO failed to conduct, as required by BOP regulations, reviews of his placement in administrative detention between November 18 and December 9. App. 86 ¶ 61.

## B.    Bistrian Enters the SHU a Second Time

Shortly after Bistrian's release from the SHU on January 9, 2006, FDC officials again accused him of violating the telephone rules and placed him back in the SHU for administrative detention on January 25. App. 86 ¶ 63. This time Bistrian remained there for 308 days, until his release on December 8. *Id.* He claims that Warden Levi again did not prepare a timely and appropriate administrative detention order. App. 86 ¶ 64.

Bistrian also alleges that Warden Levi and nine other FDC officials (together the "Prison Management Defendants")[3] met on a weekly basis to discuss the status of SHU inmates and to determine whether any of them should be released back into the general prison population. App. 80 ¶ 38. He claims that, during his second stay in the SHU, prison officials did not investigate the alleged phone abuse that was the supposed reason for his confinement. Instead, they intentionally confined him in administrative segregation under the pretext of a non-existent investigation in order to

---

[3] This group consists of Warden Levi, Assistant Wardens Brown and Blackman, five members of the Corrections Officers staff (Captain David Knox, Lt. David Gibbs, Sr. Officer William Jezior, Sr. Officer Bergos and Unit Manager White), and two Special Investigative Agents (J. McLaughlin and David Garraway). App. 80-81 ¶ 38.

bypass the procedural protections required for disciplinary segregation. App. 86-87 ¶¶ 65-67.

### 1. Bistrian Collaborates with the Federal Bureau of Investigation ("FBI")

In April or May 2006, Steve Northington (another SHU detainee) asked Bistrian (then an orderly in the SHU) to pass along a note to his fellow gang member and SHU detainee, Kaboni Savage. App. 89 ¶¶ 72, 74. Bistrian agreed, but later advised Lt. Gibbs and Sr. Officers Bowns, Jezior, and Bergos that he had done so. App. 89 ¶ 73. Northington and Savage are members of a drug gang from North Philadelphia. App. 89 ¶ 74. They have long and violent criminal careers with prior convictions for, among other things, robbery and aggravated assault. App. 89 ¶¶ 74-76. During a court-authorized wiretap of his SHU cell, Savage was caught on tape repeatedly threatening in graphic detail to kill the witnesses against him, their wives, parents, siblings, and young children. App. 89 ¶ 76 (citing Government's Sentencing Memorandum, *United States v. Kaboni Savage*, Criminal No. 04-269-01 (E.D. Pa. March 15, 2006)).

The FBI expressed interest in the notes being passed among Northington, Savage, and other detainees, because they were defendants in an ongoing drug gang prosecution that involved substantial witness intimidation, death threats to witnesses and law enforcement, and a firebombing that killed six family members of the Government's chief cooperating witness. App. 90 ¶¶ 78-79. After consulting with the FBI, Lt. Gibbs and Sr. Officers Bowns, Jezior, and Bergos instructed Bistrian to continue passing notes for the inmates. App. 90 ¶ 80. They told him, however, to bring the notes to the Special Investigative Services ("SIS") office at FDC Philadelphia first. App. 90 ¶¶ 80.

Bistrian passed several notes among Northington, Savage, and two other detainees over the next few weeks. App. 90 ¶ 81. Each time, Bistrian would bring the note to the SIS office. Lt. Gibbs, Sr. Officers Bowns, Jezior, and Bergos, Special Investigative Agents McLaughlin and Garraway, and Lts. Rodgers and Robinson would review the note, photocopy it if necessary, and then give it back to Bistrian with instructions to deliver it. App. 90 ¶ 81. Lt. Gibbs, Sr. Officers Bowns, Jezior, and Bergos, and Special Investigative Agents McLaughlin and Garraway forwarded some photocopies to the FBI. App. 90 ¶ 82.

But "[o]n one particular occasion" when Bistrian brought in a note for photocopying, Lt. Gibbs and Sr. Officers Bowns, Jezior, and Bergos placed the *photocopy* back in the delivery envelope instead of the original note. App. 91 ¶ 84. Bistrian claims that the note's intended recipient recognized it as a photocopy and immediately realized Bistrian's cooperation with prison officials. App. 91 ¶ 84. Bistrian also alleges that, on unspecified occasions, Lts. Gibbs, Rodgers, and Robinson, Sr. Officers Bowns, Jezior, and Bergos, and Special Investigative Agents McLaughlin and Garraway failed to return to him all notes for delivery, further notifying the intended recipients of his cooperation. App. 91 ¶ 85.

Bistrian began receiving multiple threats from the notes' intended recipients, including Northington, who threatened him on more than one occasion when they were together in the recreation yard. App. 91-92 ¶ 86. According to Bistrian, he "repeatedly advised (both verbally and in writing)" FDC officials—including Lts. Gibbs, Rodgers, and Robinson, Sr. Officers Bowns, Jezior, and Bergos, and Special Investigative Agents McLaughlin and Garraway—of the threats and the risks he faced by being confined in the SHU with the Northington gang. App. 92 ¶ 87. He insisted that members of Northington's gang would seriously harm

him if they were placed in the recreation yard with him at the same time. App. 92 ¶ 87. Despite these warnings, FDC officials took no preventive action.

## 2. Bistrian is Attacked for the First Time

On June 30, 2006, Bistrian was standing in the SHU recreation yard (a locked pen with guards posted on the outside) when Northington and two other SHU inmates approached him and began arguing about a note that he failed to deliver. App. 93 ¶ 92; 237. When Bistrian turned away, Northington punched him in the face. App. 93 ¶ 93. Bistrian was then knocked to the ground and went unconscious when his head hit a cement portion of the yard's metal cages. *Id.* While he lay unconscious, Northington and the other inmates repeatedly kicked and beat him, landing blows to his face, head, body, and midsection. App. 93 ¶ 94.

Bistrian claims that FDC guards, including Sr. Officer Jezior, intervened "[o]nly after several minutes of continued pummeling." App. 93-94 ¶ 95. According his incident report, Sr. Officer Jezior came to the SHU recreation pen in response to an alarm and, on his arrival, saw an inmate beating Bistrian in the face with closed fists. App. 250. Several staff members, including Jezior, shouted orders to the inmate to stop and back away from Bistrian, but the inmate continued his beating. *Id.* When "enough staff were present," officers entered the recreation pen and the assaulting inmate got down on his stomach and allowed himself to be handcuffed without further incident. *Id.* By then Bistrian had already suffered a dislocated left shoulder, broken teeth, and multiple contusions and lacerations to his head and face that required sutures. App. 94 ¶ 97.

Special Investigative Agent McLaughlin interviewed Northington after the attack. Presumably when asked why he

11

attacked Bistrian, "Northington stated that he got 19 and a half years because of rats and now inmate Bistrian is being used to get him [Northington] another case." App. 237. Another inmate involved in the attack admitted that he previously put a sign on his cell that read "stop snitching." App. 238.

Bistrian remained in the SHU after the attack. On July 6, 2006, Lt. Wilson prepared an administrative order purporting to place him in administrative detention for "security reasons." App. 94 ¶ 99. Bistrian claims that neither Warden Levi nor Lt. Wilson gave him a copy of this order, as required by prison regulations. App. 95 ¶ 100.

### 3. Bistrian is Attacked a Second Time

On October 12, 2006, Bistrian was attacked again in the SHU recreation yard. App. 96 ¶ 106. He was in hand restraints, waiting to be let in from the yard, when Aaron Taylor (an inmate with a history of violently attacking fellow detainees) approached him waving a "manufactured razor-blade style weapon, repeatedly slashing and cutting [his] face, arms, and legs." App. 96-97 ¶¶ 106-07.

FDC guards and staff, including Captain Knox and Lts. Acker and Dempsey, attempted to stop the attack by firing pepper spray into the recreation cage. App. 97 ¶ 109; 269. This proved ineffective, so after several minutes they used a "Tactical Blast Stun Munition," which incapacitated Taylor and allowed staff members to enter the area to attend to Bistrian. App. 97 ¶ 109. Lt. Acker interviewed Bistrian after the attack and asked him what happened. App. 276. According to Lt. Acker's report, Bistrian told him that Taylor yelled "You racist mother fucker!," and then attacked him

12

even though Bistrian had never spoken to Taylor before the incident. App. 276.[4]

Bistrian was transported to a local hospital, where he received 52 sutures to close his wounds. App. 97 ¶ 112. The attack left him with scars on his face and body as well as severe mental, emotional, and psychological injuries. App. 98 ¶ 113. Despite several requests, prison officials did not allow him to see a medical doctor again until November 9, 2006. App. 98 ¶ 114. After a brief examination, medical staff told Bistrian that "he was going to have to be 'creative' at physical rehabilitation due to his confinement in the SHU." App. 98 ¶ 114. Bistrian was released from the SHU on December 8, 2006, and transferred back to the general population. App. 99 ¶ 118.

## C.    Bistrian Enters the SHU a Third Time

After learning that they had placed Bistrian in the same unit as one of his June 30 assailants, FDC officials returned Bistrian to the SHU for a third time on December 22, 2006; he remained there until January 25, 2007. App. 99 ¶¶ 118-19.

Bistrian alleges that the Prison Management Defendants violated several prison regulations when moving him back to the SHU. For example, Warden Levi once again failed to prepare a timely and appropriate administrative detention order. App. 99 ¶ 121 (citing 28 C.F.R. § 541.22(b)). Also, because they placed Bistrian in

_____

[4] Taylor was later convicted of assault with a dangerous weapon, 18 U.S.C. § 113(a)(3), and sentenced to 120 months' imprisonment. We recently affirmed his conviction and described the racial tensions apparently inflaming inmates at FDC Philadelphia at the time of the attack. *See United States v. Taylor*, 686 F.3d 182 (3d Cir. 2012).

administrative segregation for protective purposes but not at his own request, the Prison Management Defendants were required to review his status within two work days and hold a hearing within seven days of his placement, but they failed to do so. App. 100 ¶¶ 122-24.

## D.    Bistrian Enters the SHU a Fourth Time

After having been in and out of the SHU three times, Bistrian met with forensic psychologist Dr. Stephen E. Samuel. In August 2007, Dr. Samuel informed the FDC's chief psychologist that he had diagnosed Bistrian with Post-Traumatic Stress Disorder and Dysthymic Disorder resulting from his long-term confinement in the SHU and the two attacks he suffered. App. 100 ¶ 125.

That month, Bistrian participated in the first of two sentencing hearings in his criminal case. App. 100 ¶ 126. In court filings and at the hearing, his counsel contested the legality of his placement in the SHU and his other mistreatment in prison. *Id.* Following the hearing, on September 12, 2007, Bistrian's attorney sent an email to the Assistant United States Attorney handling the sentencing, repeating his challenge to the purported telephone violation charges against Bistrian that had been used to justify his first two placements in the SHU and demanding a copy of the applicable prison regulations. App. 101 ¶ 127. The AUSA forwarded the email to FDC Philadelphia. *Id.*

The next day, Bistrian returned to the SHU, received an administrative detention order indicating that he was being held "pending investigation" of alleged telephone infractions; and attended a hearing before the Unit Disciplinary Committee, where he promptly received a sanction of a loss of phone privileges for 60 days. App. 101 ¶¶ 128-30.

14

Four days later, Bistrian's counsel wrote a letter to Warden Levi to request that he release Bistrian from the SHU and to inform him that Bistrian continued to suffer from physical and psychological injuries as a result of his prior confinement in the SHU and the two prior assaults. App. 101-102 ¶ 131. During this stint in the SHU, Warden Levi told Bistrian he "would not see the light of day again." App. 102 ¶¶ 133. He also sent FDC staff members to coerce Bistrian into confessing by telling him that he would not be released from the SHU unless he confessed to the alleged violations. App. 102 ¶ 134. Bistrian remained in the SHU until December 4, 2007. App. 102 ¶ 132.

On March 14, 2008, Judge DuBois sentenced Bistrian to 57 months' imprisonment. App. 8.

## II.    Procedural Background

Bistrian filed this suit in June 2008. Of the 19 counts in the Complaint, Counts I-V allege violations of Bistrian's Fifth Amendment substantive and procedural due process rights, Counts VI-IX relate to the Eighth Amendment, Count X is a First Amendment retaliation claim, and Counts XI-XIX are against the United States under the Federal Tort Claims Act ("FTCA"). Bistrian seeks $50 million in damages against the FDC defendants in addition to other relief. *See, e.g.*, App. 109 ¶ 156.

Each of the defendants moved to dismiss the Complaint, arguing, among other things, that Bistrian failed to exhaust his administrative remedies, that his claims were untimely, and that he failed to allege sufficient facts to state claims that overcome their entitlement to qualified immunity. The District Court granted motions to dismiss 13 of the 19 counts (Counts VI-IX and XI-XIX). The propriety of these dismissals is not before us.

The Court denied, however, the FDC defendants' motion to dismiss Counts I-V and Count X. The Court found that Bistrian adequately alleged individual involvement of the 28 named defendants in the constitutional torts at issue to survive dismissal on qualified immunity grounds.

Twenty-seven of the 28 defendants appeal the District Court's refusal to dismiss Count I-V and X. In his appellate brief, Bistrian — "[i]n the interests of narrowing the scope of this action"— does not oppose Appellants' challenge to his claim sounding in deliberate indifference to medical needs (Count IV, Fifth Amendment), but he intends to proceed on that claim against defendant Reynolds, who has not appealed the District Court's decision. Bistrian Br. 2. He also concedes in his brief to the dismissal of Appellants Martinez, Kaiser, Dalmasi, Fausto, Bokhari, Alsbrooks, Zorrilla, Massa, and Still. *Id.* at 2-3. Counsel further clarified the configuration of claims and appellants in play at oral argument.

Taking into account the District Court's decision and Bistrian's concessions and clarifications, the following claims and persons are at issue in this appeal.

Count I: Fifth Amendment Substantive Due Process (Failure to Protect)

- Claim: Appellants failed to protect Bistrian from the June 30, 2006 assault, both before and during the attack.

- Appellants/defendants (13): (1-10) The 10 Prison Management Defendants; (11) Sr. Officer Bowns; (12) Lt. Rodgers; and (13) Lt. Robinson.

16

Count II: Fifth Amendment Substantive Due Process (Failure to Protect)

- Claim: Appellants failed to protect Bistrian from the October 12, 2006 assault, both before and during the attack.

- Appellants/defendants (12): (1-10) The 10 Prison Management Defendants; (11) Lt. Dempsey; and (12) Lt. Acker.

Count III: Fifth Amendment Substantive Due Process

(Punitive Detention)

- Claim: Bistrian's placement and continued detention in the SHU deprived him of his liberty interest, as an inmate awaiting sentencing, in being free from punishment.

- Appellants/defendants (13): (1-10) The 10 Prison Management Defendants; (11) Lt. Rodgers; (12) Lt. Robinson; and (13) Lt. Armisak.

Count V: Fifth Amendment Procedural Due Process

- Claim: Bistrian's placement and continued detention in the SHU failed to comply with the Fifth Amendment's procedural due process requirements.

- Appellants/defendants (11): (1-10) The 10 Prison Management Defendants; and (11) Lt. Wilson.

Count X:  First Amendment (Retaliation)

- Claim:  Bistrian's placement and continued detention in SHU after his attorney challenged his previous placement as retaliatory for exercising First Amendment rights.

- Appellants/defendants (10):  (1-10) The 10 Prison Management Defendants.

## III.    Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1331. The collateral order doctrine allows this appeal because it is from an order denying a motion to dismiss that raises a qualified immunity defense turning on an issue of law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 670-75 (2009); *Argueta v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, 69 (3d Cir. 2011) ("Pursuant to *Iqbal*, our appellate jurisdiction extends beyond merely determining whether the complaint avers a clearly established constitutional violation, and we also have the power to consider the sufficiency of the complaint itself.").

We exercise plenary review over the District Court's denial of Appellants' motion to dismiss. *See Iqbal,* 556 U.S. at 674; *Argueta*, 643 F.3d at 69.

## IV.    Discussion

We must decide whether the Complaint adequately alleges Appellants' personal involvement in the violation of Bistrian's clearly established constitutional rights. Appellants claim the Complaint "attributes a string of several defendants

18

to each allegation of wrongful conduct," and in doing so "this 'everyone in the institution' pleading . . . fails to provide the personal involvement or some affirmative action by the individual defendants." Appellants' Br. 3. They also argue that they are entitled to qualified immunity because some of the alleged misconduct does not involve the violation of clearly established constitutional rights. Thus, they insist that the Complaint must be dismissed.

## A.    The Pleading Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court's most recent explications of this Rule appear in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Iqbal*. Our Court has had several occasions to examine those decisions in depth, *see, e.g.*, *Argueta*, 643 F.3d at 70-73; *Santiago v. Warminster Twp.*, 629 F.3d 121, 129-30 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 209-211 (3d Cir. 2009), and so we begin by recounting only their essential teachings.

The touchstone of the pleading standard is plausibility. The Court in *Iqbal* explained that

> [t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

19

> misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

556 U.S. at 678 (citations and quotation marks omitted).

To determine whether a complaint meets the pleading standard, our analysis unfolds in three steps. First, we outline the elements a plaintiff must plead to a state a claim for relief. *See id.* at 675; *Argueta*, 643 F.3d at 73. Next, we peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. Finally, we look for well-pled factual allegations, assume their veracity, and then "determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. This last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, the Supreme Court recognized an implied private right of action for damages against federal officials who have violated a person's Fourth Amendment rights. 403 U.S. 388 (1971). The Court has extended the *Bivens* implied right of action to suits for damages brought

20

under the equal protection component of the Due Process Clause of the Fifth Amendment, see *Davis v. Passman*, 442 U.S. 228 (1979), and the Cruel and Unusual Punishments Clause of the Eighth Amendment, *see Carlson v. Green*, 446 U.S. 14 (1980). Since *Carlson*, however, the Court "has consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Corr. Servs. Corp. v. Malesko,* 534 U.S. 61, 68 (2001). Nonetheless, "[i]n the limited settings where *Bivens* does apply, the implied cause of action is the 'federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983.'" *Iqbal*, 556 U.S. at 675-76 (quoting *Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006)). When the claim is available, "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Id*. at 676.

But unlike other legal contexts, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Id*. "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id*.[5]

---

[5] This case gives us no occasion to wade into the muddied waters of post-*Iqbal* "supervisory liability." "Numerous courts, including this one, have expressed uncertainty as to the viability and scope of supervisory liability after *Iqbal*." *Santiago*, 629 F.3d at 130 n.8 (collecting cases); *see also Argueta*, 643 F.3d at 70. Neither the parties nor the District Court mention "supervisory liability" as a possible basis for recovery here. As we understand his claims, Bistrian alleges that the named defendants directly and personally participated

Moreover, the sufficiency of a plaintiff's allegations in a *Bivens* action is "inextricably interwined with" and "directly implicated by" the defense of qualified immunity. *Iqbal*, 556 U.S. at 673. Under that defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson* v. *Creighton,* 483 U.S. 635, 640 (1987). To meet this test, generally "there must be sufficient precedent at the time of [the defendant's] action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001). Thus, to overcome the assertion of qualified immunity at the motion to dismiss stage, a plaintiff must sufficiently plead not only a violation of a constitutional or statutory right, but also a violation of a clearly established one.

### B.     Counts I & II:  Failure to Protect from Inmate Violence

"Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotation marks omitted). As such, the Eighth Amendment's Cruel and Unusual Punishments Clause imposes on prison officials "a duty to protect prisoners from violence at the hands of other prisoners." *Id.* at 833

---

in the alleged unconstitutional conduct. That is the only theory of recovery we consider.

22

(quotation marks omitted); *see also Beers-Capitol v. Whetzel*, 256 F.3d 120, 130-33 (3d Cir. 2001); *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997).

The Cruel and Unusual Punishments Clause, however, does not apply until an inmate has been both convicted of and sentenced for his crimes. *See Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989); *Hubbard v. Taylor*, 399 F.3d 150, 164 (3d Cir. 2005) (hereinafter "*Hubbard I*"). Thus, an inmate awaiting sentencing must look to either the Fifth Amendment's or the Fourteenth Amendment's Due Process Clause for protection. *See Bell v. Wolfish*, 441 U.S 520, 535 n.16 (1979); *Fuentes v. Wagner*, 206 F.3d 335, 341-42 (3d Cir. 2000). We have not yet in a precedential opinion recognized that an unsentenced inmate may bring a due process-grounded failure-to-protect claim of the sort that a sentenced inmate can bring under the Eighth Amendment. But it is well established that, under the Constitution's guarantees of due process, an unsentenced inmate "is entitled[,] at a minimum, to no less protection than a sentenced inmate is entitled to under the Eighth Amendment." *Fuentes*, 206 F.3d at 344 (quotation marks and alterations omitted). Therefore, Bistrian — as an inmate who at all relevant times was either not yet convicted or convicted but not yet sentenced — had a clearly established constitutional right to have prison officials protect him from inmate violence.[6]

Still, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for

---

[6] Although it is a misnomer, the case law often refers to an inmate awaiting sentencing — even if he has pled guilty to his crimes or been convicted after trial — as a "pretrial detainee." *See, e.g.*, *Fuentes*. 206 F.3d at 341-43.

23

prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. To state a claim for damages against a prison official for failure to protect from inmate violence, an inmate must plead facts that show (1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm. *Id.* at 834; *Hamilton*, 117 F.3d at 746.

"Deliberate indifference" in this context is a subjective standard: "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." *Beers-Capitol*, 256 F.3d 120 at 125. It is not sufficient that the official should have known of the risk. *Id.* at 133. A plaintiff can, however, prove an official's actual knowledge of a substantial risk to his safety "in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. In other words, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

Prison officials may escape liability for deliberate indifference claims in several ways. They "might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844. "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable" on a failure-to-protect claim. *Id.* at 845; *see also Hamilton*, 117 F.3d at 746

(noting that prison officials have "a duty . . . to take reasonable measures to protect prisoners from violence at the hands of other prisoners") (quotation marks omitted).

### 1. The Officials' Alleged Deliberate Indifference to the Risk Posed by Bistrian's Continued Detention in the SHU

We do not infer that the decision to keep Bistrian in the SHU after his cooperation became exposed was, by itself, unreasonable. This is so whether we "put[] it in terms of duty or deliberate indifference." *Farmer*, 511 U.S. at 845. More is needed to sustain a failure-to-protect claim.

BOP regulations suggest that, generally speaking, officials can better protect inmates when they are in the SHU rather than the general population. *See* 28 C.F.R. § 541.22 (describing SHUs as units "where inmates are securely separated from the general inmate population" to "help ensure the safety, security, and orderly operation of correctional facilities"). According to Bistrian's own allegations, inmates in the SHU are in solitary or near-solitary conditions "for 23 to 24 hours a day, with little or no opportunity to interact with other inmates." App. 75 ¶ 12. Given these conditions, it seems reasonable to assume that an inmate would generally be less at physical risk in the SHU than elsewhere in the prison.

Still, placing an informant in the SHU does not automatically shield officials from suit. If they are deliberately indifferent to a particular risk that an informant faces while in the SHU, that may form the basis of a failure-to-protect claim. For example, the Court of Appeals for the Eighth Circuit has held that allowing an inmate with known, violent propensities to have access to an informant in administrative segregation was unreasonable and thus a

25

possible constitutional violation. Yet it described the decision to move the informant to administrative segregation in the first place as "an apparently reasonable response." *Reece v. Groose*, 60 F.3d 487, 491 (8th Cir. 1995). Here too we conclude that keeping Bistrian in the SHU was itself not unreasonable, but we also consider whether Bistrian has plausibly alleged that officials were deliberately indifferent to specific and substantial risks that he faced while in the SHU.

  2. <u>The Officials' Alleged Deliberate Indifference to the Risk Posed by Bistrian's Placement in a Locked Recreation Pen with Northington, et al.</u>

  After stripping away conclusory allegations not entitled to the presumption of truth, we conclude that Bistrian states a plausible failure-to-protect claim against the ten Prison Management Defendants, Lts. Rodgers and Robinson, and Sr. Officer Bowns based on Bistrian's placement in the recreation yard with Northington and his gang. First, Bistrian alleges that putting him in a locked recreation area with Northington *et al.* posed a substantial risk of serious harm because (a) Northington and others knew of Bistrian's cooperation with prison officials plus (b) Northington had a violent criminal past and had previously threatened to attack Bistrian in the recreation yard because of that cooperation. Second, Bistrian alleges that officials were deliberately indifferent to the obvious risk posed because they made no attempt to prevent his placement in the yard with Northington despite the fact that he (Bistrian) repeatedly advised the officials responsible for the photocopying operation of the threats Northington and others made. Third, Bistrian pleads causation: Northington and two other inmates violently attacked him on June 30, 2006 in the recreation yard because he cooperated with prison officials, not for some other reason.

26

We consider the supporting factual allegations in further detail.

First, Bistrian has plausibly alleged that Northington and other inmates knew that he was cooperating with prison officials. Bistrian claims that "[o]n one particular occasion," after FDC officials photocopied an intercepted note, they placed the photocopy in the delivery envelope instead of the original. App. 91 ¶ 84. It is reasonable to infer that the intended recipient could recognize the difference between a hand-written note and a photocopy, and immediately assume Bistrian's cooperation with prison officials. Bistrian also alleges that, on unspecified occasions, officials failed to return to him all notes for delivery. App. 91 ¶ 85. Again, it is reasonable to infer that the inmates who sent the undelivered notes eventually learned that they were not delivered and assumed Bistrian's cooperation with prison officials. We are further convinced of the reasonableness of these inferences because Bistrian began receiving multiple threats from the notes' intended recipients, including Northington, who threatened him on more than one occasion when they were together in the recreation yard. App. 91-92 ¶ 86.

Next, having plausibly pled that Northington and other inmates knew of his cooperation, Bistrian has also plausibly pled that that they were likely to retaliate violently if placed in the same locked recreation cage. Northington was not a non-violent, white-collar criminal. He was a member of a violent drug gang with a prior conviction for (among other things) robbery and aggravated assault. App. 89 ¶¶ 74-75. At the time he was also a co-defendant in an ongoing prosecution that involved substantial witness intimidation, death threats to witnesses and law enforcement, and a firebombing that killed six family members of the Government's chief cooperating witness. App. 90 ¶¶ 78-79. Not only did Northington have violent propensities, but he

27

made his violent intentions quite clear by threatening Bistrian on more than one occasion when they were together in the recreation yard.  App. 91-92 ¶ 86

Turning to the officials' supposed deliberate indifference, Bistrian plausibly alleges that certain prison officials actually knew that he faced an excessive risk of harm by being placed in the SHU recreation yard with Northington and his cronies but failed to take any preventive measures. According to Bistrian, he "repeatedly advised (both verbally and in writing)" FDC officials, including Lts. Gibbs, Rodgers, and Robinson, Sr. Officers Bowns, Jezior, and Bergos, and Special Investigative Agents McLaughlin and Garraway, of the multiple threats Northington and others made after Bistrian's cooperation was exposed as well as the specific risk that he would suffer serious harm if placed in the recreation yard with them at same time.  App. 92 ¶ 87.  Yet, based on what is before us, nothing was done to abate the potential threat.

We acknowledge that when inmates claim they are in danger, they confront prison officials with an "arduous task." *Young v. Quinlan*, 960 F.2d 351, 363 n.23 (3d Cir. 1992). "[P]risoners may feign their fear of physical harm simply to manipulate a transfer," in the hope, for example, of obtaining more desirable living arrangements.  *Id.* (quotation marks omitted).  But here, Bistrian sets out sufficient factual allegations, which we must accept as true, that make his repeated pleas radically different from an out-of-the-blue and unadorned "I'm-in-trouble" entreaty.  The eight officials that Bistrian claims he "repeatedly advised (both verbally and in writing)" were the very officials that orchestrated the botched note-photocopying operation.  App. 90 ¶¶ 80-82.  Given their familiarity with the scheme and the players involved, it is quite plausible that they knew Bistrian's cries for help were legitimate and that he faced a substantial risk of serious harm.

After all, the genesis of the operation was a desire to assist an FBI investigation into violent criminal activity by Northington and others that included, among other things, substantial witness intimidation. App. 90 ¶ 78.

Moreover, the alleged number of tortfeasors in this case does not undermine the plausibility of the underlying torts. In *Young v. Quinlan*, we allowed an inmate's failure-to-protect claim to proceed past summary judgment when, among other things, he claimed to have "told [ten named prison officials] several times that he was concerned for his safety and needed to be placed in protective custody," and each of these ten officials had failed to respond reasonably to stop the assaults by other inmates. 960 F.2d 351, 363 (3d Cir. 1992). Here too the fact that Bistrian claims to have specifically warned eight officials of the risks he faced does not transform his allegations into impermissible "group pleading."

In addition, it is reasonable to infer at this early stage that the other Prison Management Defendants also knew of the substantial risk Bistrian faced by being put in the same locked recreation yard as Northington and failed to respond reasonably. Bistrian claims that the ten Prison Management Defendants met "[o]n a weekly basis . . . to review the list of inmates in the SHU and discuss and determine which inmates would be released from the SHU and which inmates would remain confined." App. 80 ¶ 38. Five (Gibbs, Jezior, Bergos, McLaughlin, and Garraway) of those ten people were involved in the note operation and, for the reasons discussed above, plausibly were aware of the risk Bistrian faced. Affording Bistrian all reasonable inferences from his allegations and construing them in the light most favorable to him, as we must, it is plausible that these five Appellants discussed the problems with the note operations and the threats Bistrian repeatedly reported with the remainder of the

29

Prison Management Defendants during their weekly meetings.

Of course, discovery may reveal that some Prison Management Defendants did not know that the lid had been blown off the note sting, or, if they did know, that some objected to Bistrian's continued use of the recreation yard with the inmates he cooperated against. At this point, however, we cannot expect clairvoyance from Bistrian. He obviously was not present for Prison Management Defendants' meetings, but he has alleged other facts that plausibly suggest that they knew about his situation and failed to respond. Further investigation will show what was discussed behind closed doors.

Finally, Bistrian has alleged adequate facts to suggest that he was attacked as a result of his being an informant and the FDC officials' failure to respond reasonably to the dissemination of that fact. It can be plausibly inferred from the fact Northington himself was one of the assailants that he attacked Bistrian because of the latter's cooperation. Further, Northington's behavior immediately before and after that attack also suggests that it occurred because Bistrian was an informant. Northington and two other SHU inmates approached Bistrian in the SHU recreation pen and began arguing about a note that he failed to deliver. App. 93 ¶ 92. In a post-attack interview, Northington complained about being in prison "because of rats" and lamented how Bistrian was "being used to get him [Northington] another case." App. 237.

In sum, Bistrian has stated a plausible claim that thirteen officials violated their constitutional duty to protect him from inmate violence by being deliberately indifferent to the risk posed by his placement in the recreation yard with Northington and others who knew of his prior complicity with

30

prison authorities. If this claim fails to survive a motion to dismiss, little does.

### 3. The Officials' Alleged Deliberate Indifference to the Risk Posed by Bistrian's Placement in a Locked Recreation Pen with Taylor

Given prisoners' attitudes about "snitches," it is reasonable to infer that placing Bistrian in a locked recreation pen with any violent inmates, not only those he specifically cooperated against, created a substantial risk of serious harm. But Bistrian does not allege that Taylor had any connection to Northington and his cohorts or that Taylor otherwise attacked him because he was an informant. Instead, Bistrian refers to Taylor's "history of violent assaults against other inmates" in his complaint, and generally creates the impression that Taylor's attack was unprovoked, inexplicable, and unrelated to his participation in the note-copying operation. App. 96 ¶ 105; 97 ¶ 107; 110 ¶ 158.[7] Thus, according to Bistrian, the risk of the harm that occurred was the risk that an inmate with a history of violence might attack another inmate for an unknown reason. We cannot conclude on these allegations that prison officials were deliberately indifferent to such a speculative risk.

---

[7] Lt. Acker's report of the incident, which was attached to Bistrian's complaint, suggests the attack may have been motivated by Taylor's belief that Bistrian was a racist. App. 276. Bistrian makes no reference in the complaint itself to the apparent racial tensions infecting FDC Philadelphia at the time, which we described in our opinion in Taylor's case, nor to Taylor's allegations that Bistrian instigated the attack in the yard by telling Taylor that he was "going down." *See Taylor*, 686 F.3d at 185.

####    4.    The Officials' Alleged Failure to Intervene
####         Appropriately in the Assaults

In *Smith v. Messinger*, we held that a corrections officer who fails to intervene when other officers are beating an inmate may be liable on a failure-to-protect claim if the officer had "a realistic and reasonable opportunity to intervene" and "simply refused to do so." 293 F.3d 641, 650-51 (3d Cir. 2002). We are hardly breaking new ground by extending this standard to inmate-on-inmate attacks. As the Court of Appeals for the Seventh Circuit has observed, if an officer witnesses an inmate assault and fails to intervene, "his actions would seemingly constitute a paradigm case of deliberate indifference." *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008) (quotation marks omitted).

In this case, Bistrian faults the guards who were present for his assaults for not responding quickly and aggressively enough. No doubt, there are some circumstances in which an officer's response to an inmate attack is so half-hearted that it effectively amounts to no response at all. If well-pled, such a claim can survive a motion to dismiss. But surely there are cases at the other end of the spectrum in which an inmate fails to allege that an officer's response was so unreasonable as to give rise to an entitlement to relief. For example, if an inmate alleges that an assailant landed two punches in rapid succession, the fact that guards saw the first punch and reacted quickly enough to prevent a third, but not the second, is not unreasonable. Such an allegation would not survive a motion to dismiss. The key is whether prison officials acted reasonably; if so, they cannot be found liable on a failure-to-protect claim. *See Farmer,* 511 U.S. at 845.

With respect to the Northington attack, Bistrian claims that Sr. Officer Jezior was deliberately indifferent because he

intervened "[o]nly after several minutes of continued pummeling." App. 93-94 ¶ 95. But, according to Jezior's post-incident memorandum (which Bistrian attached to his complaint), Jezior was not standing around and doing nothing. He came to the SHU recreation pen in response to an alarm and, when he arrived, several officers (himself included) unsuccessfully ordered the assailant to stop. App. 250. When "enough staff were present," they entered the pen and subdued the assailant. *Id.* At this point, we must construe the facts in the light most favorable to Bistrian and afford him all reasonable inferences. With that in mind, we believe that Bistrian's allegations raise enough questions about the reasonableness of Jezior's response to preclude dismissal. How long did Jezior shout orders to Northington before realizing that his words were futile? How often, in Jezior's experience, does a prisoner stop violently assaulting another inmate simply because a guard orders him to do so? How many guards are "enough" to break up a fist fight? Discovery is needed. It may be that summary judgment for Jezior is on the horizon. But right now we conclude that Bistrian has plausibly alleged that Jezior responded unreasonably to the attack, and thus this claim survives a motion to dismiss.

We reach a different result with respect to the Taylor attack. To repeat, officials at the scene attempted to stop the attack by firing pepper spray into the recreation cage. When this proved ineffective, they used a "Tactical Blast Stun Munition" to incapacitate Taylor. App. 97 ¶ 109; 269. Bistrian insists that Captain Knox and Lts. Acker and Dempsey acted with deliberate indifference by delaying their use of the Tactical Blast Stun Munition and their decision to intervene forcibly. App. 97 ¶ 111. Given the facts alleged, it is difficult, if not impossible, for us to glean deliberate indifference from the guards' weapon of choice. Although the pepper spray ultimately proved ineffective, Bistrian does

not allege facts that suggest the decision to use it was unreasonable.

## C.    Count III:  Punitive Detention

Next, Bistrian argues that his detention in administrative segregation for 447 days deprived him of his clearly established liberty interest to be free from punishment before sentencing, in violation of the Fifth Amendment's Due Process Clause.

It is important to explain the significance of Bistrian's constitutional status as a "pretrial detainee," a category of detainees that includes all inmates awaiting sentencing.  A conviction alone does not extinguish all liberty interests protected by the Constitution's guarantee of due process: "[t]he right to remain at liberty continues until a court pronounces a judgment of sentence, although after a jury has pronounced a guilty verdict the court may insist upon greater assurance that a defendant will submit to sentence." *Cobb v. Aytch*, 643 F.2d 946, 962 (3d Cir. 1981) (en banc).  As such, pretrial detainees have "federally protected liberty interests that are different in kind from those of sentenced inmates." *Id.* at 957.  "Unlike sentenced prisoners, who . . . must look to state law for the protection of their personal liberties, pretrial detainees have liberty interests firmly grounded in federal constitutional law." *Id.*

Given pretrial detainees' federally protected liberty interests, the Supreme Court in *Bell v. Wolfish* held that "under the Due Process Clause . . . a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."  441 U.S. 520, 535 (1979).[8]  Still, "[n]ot

---

[8] Although pretrial detainees are, at least, on equal footing with sentenced inmates when they claim that prison officials

every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense . . . ." *Id.* at 537. For example, conditions that are reasonably related to a penal institution's interest in maintaining jail security typically pass constitutional muster. *Id.* at 540. Under *Bell*, a "particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose." *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007) (quoting *Rapier v. Harris*, 172 F.3d 999, 1005 (7th Cir. 1999)). "In evaluating a pretrial detainees's claim of unconstitutional punishment, courts must examine the totality of the circumstances within the institution." *Id.* Since *Bell*, we have conducted exhaustive examinations of the Court's "no-punishing-pretrial-detainees" rule and applied the Court's teachings in a long series of decisions. *See, e.g.*, *Hubbard v. Taylor*, 538 F.3d 229, 231-36 (3d Cir. 2008) (hereinafter "*Hubbard II*"); *Stevenson*, 495 F.3d at 67-69; *Hubbard I*, 399 F.3d at 157-68; *Fuentes*, 206 F.3d at 341-43; *Union Cnty. Jail Inmates v. Di Buono*, 713 F.2d 984, 991-92 (3d Cir. 1983).

Despite our history with the *Bell* test and the distinction it draws between those inmates sentenced and those not, Appellants confusingly pin their qualified immunity hopes to our decisions in *Griffin v. Vaughn*, 112

---

failed to protect them from other inmates, they have an indisputable advantage when they claim that they were unconstitutionally punished. *See Bell*, 441 U.S. at 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment.").

F.3d 703 (3d Cir. 1997), and *Fuentes v. Wagner*, 206 F.3d 335 (3d Cir. 2000). *See* Appellants' Br. 48-49. In *Griffin* we held that the conditions experienced by a *sentenced* inmate while in the SHU did not impose on him an "atypical and significant hardship" such that he was deprived of a state-created liberty interest in violation of the Fourteenth Amendment's Due Process Clause. 112 F.3d at 706 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). But as *Griffin* itself makes clear and as we have explained at least twice before, *Sandin*'s "atypical and significant hardship" test applies only to sentenced inmates, while the *Bell* test applies to pretrial detainees. *See Stevenson*, 495 F.3d at 69 n.4 ("*Sandin* does not apply [to pretrial detainees]. *Sandin* concerned punishment of a sentenced prisoner, and therefore required a completely different analysis.") (quoting *Fuentes*, 206 F.3d at 342 n.9).

*Fuentes* also offers Appellants no help. They point to our statement in that case that "it is impractical to draw a line between convicted prisoners and pretrial detainees for the purpose of maintaining jail security." Appellants Br. 49 (quoting *Fuentes*, 206 F.3d at 347). This selective quotation is, at best, misguided and closer to misleading. As we explained in *Fuentes*, "claims based on excessive force and claims based on conditions of confinement are different in kind." 206 F.3d at 347 (quoting *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir. 1993)). Because of this difference, we did not apply the *Bell* due process standard concerning confinement to a pretrial detainee's excessive force claim. Instead, we held that the more demanding "Eighth Amendment cruel and unusual punishments standards found in *Whitley v. Albers*, 475 U.S. 312 (1986) and *Hudson v. McMillian*, 503 U.S. 1 (1992) apply to a pretrial detainee's excessive force claim *arising in the context of a prison disturbance*." *Id.* (emphasis in original). Not surprisingly, in that context we could "draw no logical or practical distinction

36

between a prison disturbance involving pretrial detainees, convicted but unsentenced inmates, or sentenced inmates." *Id.* Nor could we expect prison guards "to draw such precise distinctions between classes of inmates when those guards are trying to stop a prison disturbance." *Id.* at 347-48. We are puzzled, to say the least, how *Fuentes* assists Appellants in their assertion that they are entitled to qualified immunity from Bistrian's conditions-of-confinement claim.

Here, Bistrian alleges that officials punished him by placing him in the SHU for 447 days of administrative segregation. With respect to the nature of his confinement in the SHU, he claims:

- "Inmates … receive meals in their cells with no communal time permitted";

- "Recreational activities in the SHU are virtually nonexistent, and basic supplies such as paper and pencils are difficult to obtain";

- "Inmates housed in the SHU are confined to solitary or near-solitary confinement … for 23 to 24 hours a day, with little or no opportunity to interact with other inmates…," together with "sensory deprivation, with poorly lighted cells and smoked windows to prevent outside visibility";

- "Medical care in the SHU is absent or deficient"; and

- "Inmates housed in the SHU have reduced access to personal property and to legal materials and have limited ability to file

37

administrative grievances," and "[a]ccess to legal counsel is limited."

App. 75 ¶ 12. In addition, Bistrian alleges that "[d]ue to the SHU's isolative and claustrophobic nature, suicide attempts are not uncommon in the SHU … [, where] there is a greater tendency among inmates to attempt suicide" than in other parts of the prison. App. 75 ¶ 13.

Given these conditions, Bistrian's complaint raises the reasonable inference that some of his time spent in administrative detention was excessive in light of any legitimate non-punitive government purpose for his segregation. Bistrian was first confined in administrative detention in the SHU from November 18, 2005 until December 9, 2005, pending a hearing on the "minor offense of telephone abuse – non-criminal." App. 85 ¶¶ 57-59. After a DHO sanctioned him to 30 days' disciplinary segregation, he was released from the SHU on January 9, 2006. App. 85 ¶¶ 59. Given Appellants' failure to assert any legitimate non-punitive need for the segregation, Bistrian has plausibly alleged that it was excessive to keep him in the SHU for nearly a month while awaiting a hearing on seemingly minor telephone infractions.

The same may be said for Bistrian's second stint in the SHU for alleged telephone infractions, starting on January, 2006, though only until April or May, 2006, when Bistrian agreed to intercept notes and cooperate against his fellow detainees. For the remainder of his second stay and his third (from December 22, 2006 to January 25, 2007), prison officials had a legitimate non-punitive purpose for Bistrian's detention in the SHU — having him participate in the note-copying scheme and keeping him in what they thought was the safest possible place in the prison. With respect to his fourth confinement in the SHU, however, it is plausibly

alleged that Warden Levi expressly intended to punish Bistrian by placing him there after his lawyer challenged his previous confinement.

As discussed above, it is sufficient at this point that Bistrian has alleged that the Prison Management Defendants each shared responsibility for his placement in the SHU. He has not sufficiently pled, however, how Lt. Rodgers, Lt. Robinson, and Lt. Armisak, who are not among the Prison Management Defendants, were involved in the violation of his substantive due process rights.

### D.    Count IV: Violation of Bistrian's Procedural Due Process Rights

"Although pretrial detainees do not have a liberty interest in being confined in the general prison population, they do have a liberty interest in not being detained indefinitely in the SHU without explanation or review of their confinement." *Stevenson*, 495 F.3d at 69. Thus, procedural due process requires prison officials to "provide detainees who are transferred into more restrictive housing [,] for administrative purposes only [,] an explanation of the reason for their transfer as well as an opportunity to respond." *Id.* at 70.

Although *Stevenson* was decided in July 2007, after Bistrian had already been confined in the SHU three times, the rule the case announces was "compelled by our holding in *Shoats v. Horn*, 213 F.3d 140 (3d Cir. 2000)." *Stevenson*, 495 F.3d at 69. In *Shoats*, we reaffirmed that sentenced inmates are entitled to minimal due process under the Supreme Court's decision in *Hewitt v. Helms*, 459 U.S. 460 (1983), which held that the removal of a sentenced inmate from the general prison population and his transfer into administrative segregation requires at least a minimal degree of process. 213

39

F.3d at 144. As we explained in *Stevenson*, "the protections due to sentenced inmates [as discussed in *Hewitt* and *Shoats*] provide a floor for what pretrial detainees may expect." 495 F.3d at 69. Therefore, the law was sufficiently clear prior to *Stevenson* that Plaintiff was entitled to an explanation and opportunity to challenge his confinement.

Here, however, the District Court did not address Bistrian's procedural due process claim at all. Taking a similar route to the one we took in *Stevenson*, we ask the Court to consider the issue in the first instance by "examin[ing] the asserted purposes for [Bistrian's] detention, and determin[ing] whether sufficient process has been afforded." *Id.* at 71.

### E. Count X: First Amendment Retaliation

Bistrian claims the Prison Management Defendants detained him in the SHU for a fourth time on September 13, 2007, in retaliation for protesting his prior confinements in the SHU. App. 101 ¶ 128. As noted, the day after the Assistant U.S. Attorney handling Bistrian's case notified officials at FDC Philadelphia that Bistrian had challenged his prior confinements in the SHU, he was (1) returned to the SHU, (2) received an administrative detention order indicating that he was being held "pending investigation" of alleged telephone infractions, and (3) attended a hearing before the Unit Disciplinary Committee (where he promptly received the sanction of a loss of phone privileges for 60 days). App. 101 ¶¶ 128-30. After Bistrian's counsel asked Warden Levi to release Bistrian from the SHU, the Warden purportedly told Bistrian he "would not see the light of day again." App. 102 ¶¶ 133. Levi also allegedly sent FDC staff members to coerce Bistrian into confessing by telling him that he would not be released from the SHU unless he confessed to the alleged violations. App. 102 ¶ 134.

40

Retaliating against a prisoner for the exercise of his constitutional rights is unconstitutional. *See, e.g.*, *Mitchell v. Horn*, 318 F.3d 523, 529-31 (3d Cir. 2003); *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001); *Allah v. Seiverling*, 229 F.3d 220, 224-26 (3d Cir. 2000). To state a claim for retaliation, a plaintiff must allege that: (1) he was engaged in constitutionally protected conduct, (2) "he suffered some 'adverse action' at the hands of the prison officials"; and (3) "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision" to take that action. *Rauser*, 241 F.3d at 333.[9]

The plausibility of Bistrian's allegations with respect to the first and third elements is not in dispute. Instead,

---

[9] We acknowledge that the Supreme Court has been reluctant to extend the *Bivens* implied right of action to new contexts, and in recent cases has conspicuously avoided extending it to First Amendment claims. *See Reichle v. Howards*, 132 S.Ct. 2088, 2093 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims."); *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) ("Because implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability to any new context or new category of defendants. . . . Indeed, we have declined to extend *Bivens* to a claim sounding in the First Amendment. Petitioners do not press this argument, however, so we assume, without deciding, that respondent's First Amendment claim is actionable under *Bivens*."). Our Court, however, relying on *Bivens*, has held that "a federal cause of action for damages may be implied directly from the [F]irst [A]mendment." *Milhouse v. Carlson*, 652 F.2d 371, 374 (3d Cir. 1981); *see also Paton v. La Prade*, 524 F.2d 862, 869-70 (3d Cir. 1975).

Appellants argue that Bistrian has not plausibly alleged an "adverse action" because he was not "impeded in his efforts to complain to the outside world about his confinement in [the] SHU." Appellants' Br. 55. But whether placement in the SHU was "sufficient to deter a person of ordinary firmness from exercising his constitutional rights" is an objective inquiry and ultimately a question of fact. *Rausser*, 241 F.3d at 333; *see also Allah,* 229 F.3d at 225. In *Allah*, we explained that where "confinement in administrative segregation resulted, *inter alia*, in reduced access to phone calls, reduced access to the commissary, reduced access to recreation, confinement in his cell for all but five hours per week, denial of access to rehabilitative programs and, significantly, inadequate access to legal research materials and assistance," "[a] fact finder could conclude from those facts that retaliatory continued placement in administrative confinement would 'deter a person of ordinary firmness from exercising his First Amendment rights.'" *Id.* (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)). As described above, Bistrian has alleged very similar facts as to the nature of this confinement in the SHU. Thus, his allegations create a plausible inference that continued placement in the SHU was retaliatory and in violation of his free speech rights.

## V. Conclusion

For these reasons, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion. To summarize, in addition to Bistrian's deliberate indifference claim against Reynolds, which was not at issue here, the following claims against the following defendants remain.

| Count I: Fifth Amendment Substantive Due Process (Failure to Protect) |
| --- |
| • Claim: Appellants were deliberately indifferent to the |

risk posed by placing Bistrian in the same locked recreation pen as Northington and his gang.

- Appellants/defendants (13): (1-10) The 10 Prison Management Defendants; (11) Sr. Officer Bowns; (12) Lt. Rodgers; and (13) Lt. Robinson.

- Claim/defendant: Jezior was deliberately indifferent to Bistrian's safety during the Northington attack.

Count III: Fifth Amendment Substantive Due Process

(Punitive Detention)

- Claim: Bistrian's first detention in the SHU, his second until the beginning of the note-copying operation, and his fourth, deprived him of his liberty interest, as an inmate awaiting sentencing, to be free from punishment.

- Appellants/defendants (10): (1-10) The 10 Prison Management Defendants.

Count V: Fifth Amendment Procedural Due Process

- Claim: Bistrian's placement and continued detention in the SHU failed to comply with the Fifth Amendment's procedural due process requirements.

- Appellants/defendants (11): (1-10) The 10 Prison Management Defendants; and (11) Lt. Wilson.

43

Count X:  First Amendment (Retaliation)

- Claim:  Bistrian's placement and continued detention in SHU after his attorney challenged Bistrian's previous placement was retaliatory for exercising his First Amendment rights.

- Appellants/defendants (10):  (1-10) The 10 Prison Management Defendants.