**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3248
_____

JAMAR L. TRAVILLION,
                Appellant

v.

JOHN E. WETZEL, Secretary of Corrections;
DORINA VARNER, Chief Grievance Officer;
STEVEN GLUNT, Superintendent; MARIOSA LAMAS, Superintendent;
JEFFREY A. RACKOVAN, Assistant Superintendent/Grievance Coordinator;
SHARON CLARK, Unit Manager; D.R. KERNS, Lieutenant of Corrections;
J.W. SUTTON, Lieutenant of Corrections; J.T. HARDY, Lieutenant of Corrections;
S.S. SETTLE, Lieutenant of Corrections; J.T. BURTON, Sergeant of Corrections;
K.L. RHEA, Sergeant of Corrections; OFFICER M.W. DUNCAN;
FNU DRUCKEMILLER, Officer of Corrections;
C.L. RUTHERFORD, Officer of Corrections;
FNU GATES, Officer of Corrections; FNU PERKS, Officer of Corrections;
E.F. WEAVER, Office of Corrections; FNU SHERMAN, Officer of Corrections;
FNU CRAWFORD, Officer of Corrections; FNU STOVER, Officer of Corrections,
In Their Individual and Official Capacities
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 1-14-cv-01159)
District Judge:  Honorable John E. Jones III
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
December 10, 2018
Before:  GREENAWAY, JR., RESTREPO and FUENTES, Circuit Judges

(Opinion filed: April 8, 2019)

_____

OPINION*

_____

PER CURIAM

Jamar Travillion appeals the District Court's order of summary judgment. The District Court ruled in favor of one set of Defendants on failure to protect claims, and in favor of another set of Defendants on denial of adequate medical care claims. For the following reasons, we will affirm the judgment in part and vacate and remand in part.

Travillion's claims stem from the prison's decision to put him in a restricted housing cell on May 5, 2012, with inmate Keith Johnson. On June 14, 2012, a prison guard escorted Travillion back to his cell after a shower. Johnson appeared to be sleeping. Without first restraining Johnson, as prison procedure required, the guard closed the door on Travillion, who was still cuffed. Johnson pounced on Travillion, slammed him to the ground, punched him, and put Travillion's tether around his neck to try to choke him. A few minutes later, guards were able to restrain Johnson and remove him to another cell. Travillion was checked out by a nurse, who noted superficial scratches. Subsequently, in the late night/early morning hours, Travillion vomited what he believed to be blood. His request for medical care at that time was denied—he was told to tell the guard in the morning. He alleged that he vomited several times and lost

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

consciousness. He was seen by medical personnel in the morning who diagnosed him with a possible mild concussion and gave him an injection for nausea. Travillion alleged that the incident led to a sciatic nerve injury, which causes him severe pain, and that he "suffers from nightmares, sever [sic] anxiety and a heightened state of vigilance against all individuals to whom he is classified/assigned as a cell partner." Dkt. #1.

On July 5, 2012, Travillion filed Grievance 418619 regarding the June 14 attack. Travillion pursued the grievance through all three tiers of the prison's grievance system. Following the final denial of his grievance, Travillion filed a civil rights complaint against Defendants, alleging Eighth and Fourteenth Amendment violations for failure to protect and inadequate medical care, and related state law claims. After a motion for summary judgment,[1] the District Court ruled in favor of Defendants on the failure to protect and inadequate medical care claims, and declined to exercise jurisdiction over the state law claims.[2]

---

[1] The District Court had also previously considered a motion to dismiss, which it granted in part and denied in part following a motion for reconsideration. Travillion does not challenge those previous rulings on appeal. See F.D.I.C. v. Deglau, 207 F.3d 153, 169 (3d Cir. 2000) (finding an issue not raised in opening brief on appeal was waived and would not be addressed).

[2] We have jurisdiction under 28 U.S.C. § 1291. We review the District Court's ruling on a motion for summary judgment de novo. Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 826 (3d Cir. 2011). Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Kaucher v. County of Bucks, 455 F.3d 418, 422–23 (3d Cir. 2006). A party opposing summary judgment must cite to specific materials in the record that demonstrate the existence of a disputed issue of

## I. Administrative Exhaustion

The Prison Litigation Reform Act (PLRA) requires an inmate to exhaust "such administrative remedies as are available" before bringing suit under § 1983 to challenge prison conditions. Ross v. Blake, 136 S. Ct. 1850, 1854–55 (2016) (citing 42 U.S.C. § 1997e(a)). Section 1997e mandates "proper" exhaustion; thus, a "procedurally defective administrative grievance or appeal" does not satisfy the mandatory exhaustion requirement. Woodford v. Ngo, 548 U.S. 81, 83–84 (2006); see also Spruill v. Gillis, 372 F.3d 218, 222 (3d Cir. 2004) (noting that exhaustion is determined by comparing prisoner's compliance with prison's administrative regulations governing inmate grievances).

In Pennsylvania, inmate grievances are handled according to the Department of Corrections' Inmate Grievance System Policy DC-ADM 804. Dkt. #63-12 at 6–31. This policy, among other things, requires grievances to "include the date, approximate time and location of the event(s) that gave rise to the grievance," and to "identify individuals directly involved in the event(s)." DC-ADM 804 § 1(A)(11); Dkt. #63-12 at 12. After an initial grievance is filed, the inmate must pursue the grievance through all levels of review to fully exhaust his claims. See Spruill, 372 F.3d at 232.

Travillion's failure to protect claim consists of three parts: (1) Defendants Kearns, Burton, Sherman, Crawford, and Stover's confinement of Travillion with Johnson on May 5, 2012; (2) Defendants Clark, Hardy, Sutton, Rutherford, and Duncan's failure or

material fact. Fed. R. Civ. P. 56(c)(1)(A).

refusal to reassign Travillion between May 5, 2012, and June 14, 2012; and (3) Defendants Gates and Druckemiller's placement of Travillion in the cell with Johnson on June 14, 2012, and their failure to quickly intervene in the subsequent assault. Travillion's denial of adequate medical care claim against Defendants Perks and Weaver stem from the events of June 15, 2012.

With regard to the failure to protect claims, the District Court ruled that Travillion fully exhausted his claims against Defendants Clark, Hardy, Sutton, Rutherford, Duncan, Gates, and Druckemiller—essentially parts (2) and (3) above. The District Court indicated that identifying Clark and "RHU Staff and Unit Management" was sufficient for complying with the identification requirements of DC-ADM 804 § 1(A)(11). However, the District Court ruled that Travillion's grievance "wholly fail[ed]" as it related to the decision of Defendants Kearns, Burton, Sherman, Crawford, and Stover to place him in the cell with Johnson on May 5 (i.e., part (1) above). Dkt. #80 at 17. The District Court did not explain why the grievance failed in this respect, but apparently it was due to a failure to comply with the identification requirement.

Travillion argues that his grievance properly raised the issue concerning the May 5 decision to place him in the cell with Johnson, noting his grievance specifically stated "on 5/5/12 SCI-Rockview staff and/or administration did place [Travillion] in [a cell with Johnson] which they knew or should have know[n] posed a real threat to his physical safety and welfare." Appellant's Br. 7. Travillion also references a separate grievance

5

that was filed, which elaborates further on the May 5 decision.[3]  Appellant's Br. 8–9.

We conclude that the District Court erred in ruling that Travillion's claims related to the May 5 decision were procedurally defaulted due to a failure to identify.  "[T]he primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued."  Williams v. Beard, 482 F.3d 637, 640 (3d Cir. 2007) (quoting Jones v. Bock, 549 U.S. 199, 219 (2007).  Indeed, if stating "RHU Staff and Unit Management" on Grievance 418619 was sufficient for identifying Defendants Hardy, Sutton, Rutherford, Duncan, Gates, and Druckemiller, it is difficult to see why stating "SCI-Rockview staff and/or administration" would not also be sufficient for identifying Defendants Kearns, Burton, Sherman, Crawford, and Stover for purposes of complying with the identification requirement of DC-ADM 804 § 1(A)(11).[4]  In any event, Travillion specified the date, location, and relevant facts related to his claim, as is also required by DC-ADM 804 § 1(A)(11).  See Johnson v. Johnson, 385 F.3d 503, 523 (5th Cir. 2004) (noting "a grievance can sufficiently identify a person even if it does not provide an actual name; functional descriptions and the like—e.g., a reference to 'the guards in the shower room' *on a certain date*—would suffice" (emphasis added)).  Consequently, the District Court should have considered the merits

---

[3] Both grievance forms were combined into one grievance, pursuant to DC-ADM 804 § 1(B)(2).  See Dkt. #63-12 at 54.

[4] This is perhaps a close question.  We note, however, that Defendants do not argue here that Travillion's grievance failed to raise the failure to protect claim regarding Kearns, Burton, Sherman, Crawford, and Stover.

6

of this claim, as it did with the other failure to protect claims.

As to the denial of adequate medical care claim against Defendants Perks and Weaver, however, we agree that Travillion failed to exhaust his administrative remedies. Nowhere in Grievance 418619 did he state the date, location, or any relevant facts, nor did he identify any individuals involved with this claim. Consequently, that claim was unexhausted and procedurally defaulted.[5] See Woodford, 548 U.S. at 92–93.

## II. Merits

We now turn to the merits. In order to survive summary judgment on his failure to protect claim, Travillion needed to point to evidence in the summary judgment record showing: "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm." Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012); see also Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997). The first element sets out an objective inquiry: that the official "knowingly and unreasonably disregarded an *objectively* intolerable risk of harm." Beers-Capitol v. Whetzel, 256 F.3d 120, 132 (3d Cir. 2001) (emphasis added). The second element, "deliberate indifference," is a subjective standard: "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." Bistrian, 696

---

[5] While Travillion does allege in his brief that he filed a separate grievance on this issue, he concedes he does not have a copy and cannot "recall with 100% certainty" if he actually submitted a grievance. Appellant's Br. 11. Accordingly, we view his allegations that the prison interfered with the grievance process as speculative, at best.

7

F.3d at 367 (quoting <u>Beers-Capitol</u>, 256 F.3d at 125).  The District Court ruled that

Travillion failed to satisfy the objective and subjective inquiries above, and also found

that he did not sustain a "serious injury."  We consider each of these issues in turn.

**A. Objective Risk of Harm**

To satisfy this element, Travillion points to several of Johnson's misconduct

reports, which he argues show Johnson's increasingly dangerous behavior in the

preceding months before Johnson attacked him.[6]  Travillion also points to the removal of

Johnson's prior cellmate, Terrance Thomas, on May 5, 2012.[7]  Finally, he argues

Johnson's own statements regarding the incidents corroborate his version of facts.[8]

---

[6] In December 2011, Johnson approached an officer "in a threatening manner with closed fists" after the officer had denied a request.  Dkt. #70-2 at 16.  On April 5, 2012, Johnson threatened to kill an officer by taking a pen and "stab[bing] his eyes out."  Dkt. #70-2 at 12.  Johnson also "chest bumped" the officer during the encounter.  Dkt. #70-2 at 14.  In the disciplinary hearing after the incident, Johnson did not deny threatening to kill the officer, but clarified that "it wasn't a pen that [he] said [he] would use" to kill him.  Dkt. #70-2 at 13.  On April 24, 2012, Johnson had an "obscene outburst," where he called a correction officer derogatory names and threatened physical violence.  Dkt. #70-2 at 9.

[7] Travillion alleges Johnson had a confrontation with Thomas, which resulted in Thomas being moved to another cell.  Travillion produces an affidavit of Shawn Hampton, who heard the commotion and witnessed corrections officers escorting Thomas out of the cell and replacing him with Travillion within an hour of the incident.  Dkt. #70-1 at 29–30.  Hampton noted Defendants Sherman and Stover were among those involved in the incident, in addition to other staff he could not name with certainty.

[8] In Johnson's response to his misconduct charge for the June 14 assault against Travillion, Johnson stated he had "told C/O Sherman and SGT. Hardy and the other staff not to bring anymore of these rats to my cell *when I kicked out my last cell[ie]* because I already know what they're trying to do to me."  Dkt. #70-2 at 40 (emphasis added).  He further stated that "if they try to give me another cell[ie] I will kill him before they can get the cuffs off."  Dkt. #70-2 at 40.

8

The District Court held that the misconduct reports showed Johnson's offending conduct was "more verbal than physical" and illustrated "Johnson's hostility toward, and disdain for, correctional officers, not other inmates." Dkt. #80 at 21. The District Court noted that the single physical encounter was merely a shove and "chest bump" and appeared to be an isolated incident. Dkt. #80 at 21. The District Court found the assertion that Johnson threatened violence against his former cellmate Thomas, resulting in the removal of Thomas and placement of Travillion in the cell, was not supported by the evidence. Rather, the District Court found it was "completely contrary to the credible record evidence which indicates Thomas was reassigned based on his request for a standard cell change due to personal issues." Dkt. #80 at 22. The "credible" evidence the District Court relies on is an affidavit by Defendant Clark.[9]

We conclude that the District Court erred by improperly weighing the evidence and making a credibility determination. See Montone v. City of Jersey City, 709 F.3d 181, 191 (3d Cir. 2013) ("[I]n considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence is to be believed[,] and all justifiable inferences are to be drawn in his favor." (internal quotations omitted)). First, the District Court gave little weight to Johnson's misconduct reports—deciding that the verbal threats of violence were to be discounted and focusing instead on the physical "chest bump"

---

[9] Clark's affidavit states that Thomas was moved on May 5 "based on his request for a standard cell change due to personal issues." Dkt. #63-6 at 3.

confrontation, which it decided was an isolated incident. In doing so, the District Court relied on a distinction between verbal threats and physical confrontations, weighing the latter as more important for satisfying the objective inquiry. This weighing of evidence is specifically reserved for the fact-finder, and it was therefore improper for the District Court to do so.[10] See Boyle v. Cty. of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998); see also Riley v. Jeffes, 777 F.2d 143, 147 (3d Cir. 1985) ("A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it . . . may be established by *much less* than proof of a reign of violence and terror." (emphasis added) (internal quotation marks omitted)).

Second, the District Court improperly weighed the evidence and made a credibility determination as it pertained to the threats of violence against Thomas by Johnson prior to Travillion's placement in the cell. The District Court found Travillion's assertion—that Johnson threatened violence against Thomas—was "not supported by the evidence" because of Defendant Clark's "credible" affidavit. Not only does this conclusion rest upon improper weighing of evidence and credibility determinations, but it also presents a

---

[10] Moreover, even if the District Court was allowed to weigh the evidence, we are not convinced it did so correctly here, as our sister circuits have found threats of violence to be sufficient to present a substantial risk for Eighth Amendment purposes. See, e.g., Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 617 n.12 (11th Cir. 2007) (concluding gang-related threats made on an inmate's life, which were explicitly reported to prison officials, presented a substantial enough risk of harm to trigger a prison official's Eighth Amendment duty to act); Odom v. S.C. Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003) (concluding that an inmate-on-inmate assault resulting in "significant physical injury," preceded by reported death threats, was sufficiently substantial for Eighth Amendment purposes).

10

disputed genuine issue of material fact: whether the change in Johnson's cellmate from Thomas to Travillion was a result of a "standard cell change" or whether it occurred because Johnson was threatening violence against Thomas.[11]  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Lemire v. Cal. Dep't of Corrs. & Rehab., 726 F.3d 1062, 1075–76 (9th Cir. 2013) ("The objective question of whether a prison officer's actions have exposed an inmate to a substantial risk of serious harm is a question of fact, and as such must be decided by a jury if there is any room for doubt."). Accordingly, the objective inquiry should have been given to a jury.

### B. Subjective Knowledge

We now turn to the subjective inquiry; that is, whether Defendants actually knew of the excessive risk and were deliberately indifferent to it.  Prison officials may escape liability for these claims in several ways:

> They might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.  In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.  Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable on a failure-to-protect claim.

Bistrian, 696 F.3d at 367–68 (internal quotations and citations omitted).  We consider

---

[11] This dispute in fact affects not only the determination of whether there was an objective risk of substantial harm, but also the critical element of subjective knowledge of risk of that harm.

11

each group of Defendants in turn.

### (1) Defendants Kearns, Burton, Sherman, Crawford, and Stover's confinement of Travillion with Johnson on May 5, 2012.

Travillion argues that Defendants Kearns, Burton, Sherman, Crawford, and Stover were aware that the removal of Thomas from Johnson's cell stemmed from an alleged outburst and threats by Johnson against Thomas. Travillion argues that in moving him to Johnson's cell on May 5, Defendants thus knew that he risked harm. Appellant's Br. 14–17. Travillion points out that the transfer happened on a weekend, when standard cell changes are not made, and argues a reasonable jury would likely find Defendant Clark's claim—that the move was based on a standard cell change—to be incredible.[12]

The District Court did not reach this inquiry in its analysis because it determined that Travillion's claim was unexhausted and procedurally defaulted as to these Defendants. Travillion's assertions perhaps present genuine issues of material fact as to the subjective knowledge of these Defendants, which the District Court should consider on remand.[13] Of course, if the District Court finds the issues to be material, summary judgment would not be appropriate.

---

[12] Hampton's affidavit corroborates Travillion's assertion that a "standard cell change" does not occur on the weekends. Dkt. #70-1 at 30.

[13] Indeed, Johnson himself stated he told Sherman, Hardy, and the other staff "not to bring anymore of these rats to my cell" after he "kicked out" Thomas on May 5.

**(2) Defendants Clark, Hardy, Sutton, Rutherford, and Duncan's
failure or refusal to reassign Travillion between May 5 and June 14.**

As to Defendants Clark, Hardy, Sutton, Rutherford, and Duncan's failure or refusal to reassign Travillion between May 5 and June 14, Travillion thoroughly details in his brief the numerous requests he repeatedly made to Defendants, and argues that their actions were not reasonable. Appellant's Br. 18–22. He argues that these requests were sufficient to put them on notice. Further, Travillion details a conversation he had with Defendant Clark, in which he told her of his concerns and requested a cell change because he feared for his safety. He also points to a follow-up letter he wrote to Clark (Dkt. #70-2 at 45) as further evidence of the conversation and actual notice of his situation.[14] Finally, Travillion points to Johnson's own statements after the June 14 attack as corroborating his version of facts. The statement reads:

> I did that to my cell[ie] because I know he be talking about me to the staff *like the other one* and that they trying to help everyone here kill me because of C/O Miller. I told C/O Sherman and SGT. Hardy and the other staff not to bring anymore of these rats to my cell *when I kicked out my last cell[ie]* because I already know what the[y're] trying to do to me. *I caught my cell[ie Travillion] talking to Ms. Clark about me when she came with PRC* and he said I was crazy. I know *he been talken [sic] to other C/O's about me to say[] I'm crazy*. I'm already dying from cancer and medical refuses to help me so I don't have anything to lose. Staff is harassing me calling me n[***]er and putting stuff in my food trying to kill me. I know the plan if they try to give me another cell[ie] I will kill him before they can get the cuffs off. I'm scared for my life.

---

[14] In her affidavit, Clark denied ever receiving any indication of "any threat or fear of violence or physical harm," from Travillion while he was celled with Johnson, and further noted that had Travillion stated he feared for his safety, "his claims would have been investigated and he would have been moved to a new cell." Dkt. #63-6 at 3–4.

13

Dkt. #70-2 at 40 (emphasis added).

With regard to these Defendants' failure or refusal to reassign Travillion between May 5 and June 14, we conclude Travillion sufficiently showed that there is a genuine issue of material fact. Specifically as to Clark, there is, without a doubt, a genuine issue of material fact as to her knowledge of risk. Travillion alleged he talked to Clark and submitted a written request for a cell change. Furthermore, Johnson's own statements tend to corroborate Travillion's version of events, as he stated one of the reasons he attacked Travillion was because he "caught" Travillion "talking to Ms. Clark about me when she came with PRC[.]" On the other hand, Clark denied receiving *any indication* of any risk of harm or any complaints from Travillion. Clearly, a dispute over whether Clark ever had actual knowledge of the risk is material, as it is a critical element for a failure to protect claim. See Anderson, 477 U.S. at 248; Bistrian, 696 F.3d at 367.

As to Hardy, Sutton, Rutherford, and Duncan, when viewing the facts in the light most favorable to Travillion, we conclude there is evidence in the record that these Defendants had knowledge of the risk Johnson posed to Travillion. On multiple occasions, Travillion approached these Defendants with his concerns and requests for a cell change. Additionally, as noted above, Johnson stated he had warned Hardy and other staff not to bring any more "rats" to his cell after he "kicked out" Thomas. While the District Court recognized that Travillion complained to these Defendants about Johnson, it seemed to indicate that these Defendants acted reasonably by informing Travillion they

14

were not responsible for cell assignments and by telling him to submit written complaints. See Bistrian, 696 F.3d at 367–68 (noting how prison officials may escape liability). The District Court also noted that Travillion's requests to these Defendants lacked specificity. Travillion contends their actions were not reasonable, as his written requests went unanswered, and he maintains that his numerous complaints called for, at a minimum, an investigation.

Whether Clark,[15] Hardy, Sutton, Rutherford, and Duncan acted reasonably or whether they should have done more is a factual inquiry that cannot be resolved on summary judgment. See Hamilton, 117 F.3d at 748–49; Young v. Quinlan, 960 F.2d 351, 363 n.23 (3d Cir. 1992) (reversing summary judgment when a prisoner told prison officials "several times" about safety concerns and wanting to be placed in protective custody, and noting that prison officials should, at a minimum, investigate each allegation of threat of violence) (superseded by statute on other grounds); see also Lemire, 726 F.3d at 1078 (explaining the subjective inquiry is "fact-intensive and typically should not be resolved at summary judgment stage"). Accordingly, we hold that the District Court erred with respect to these Defendants.

### (3) Defendants Gates and Druckemiller's placement of Travillion in the cell on June 14, and their failure to quickly intervene in the assault.

Finally, we agree with the District Court that Travillion presented no evidence that

---

[15] The District Court also appeared to indicate that even if Clark was aware of the underlying facts, liability would not attach to her because her actions were reasonable.

15

Gates or Druckemiller possessed any actual knowledge of the threat posed by Johnson prior to placing Travillion in the cell.[16]  Rather, it appears that Travillion merely complained about the tensions between him and Johnson as they escorted him to and from the showers that day.  Appellant's Br. 22.  This isolated complaint the day of the assault is not enough to impute to Gates and Druckemiller knowledge of a risk of substantial harm.  See Prater v. Dahm, 89 F.3d 538, 541 (8th Cir. 1996) ("[T]hreats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm.").  Furthermore, to the extent Travillion claims that they failed to intervene, the record clearly indicates that they took immediate action to halt the attack.

**C. Serious Injury**

Finally, the District Court held that even if Travillion had satisfied the objective and subjective inquiries, Defendants would still be entitled to summary judgment because Travillion did not suffer a "serious injury."  Dkt. #80 at 25.

We disagree.  To begin, we note that the Eighth Amendment not only protects against harm, but also protects against the *risk* of harm.  See Shelton v. Bledsoe, 775 F.3d 554, 564–65 (3d Cir. 2015); Farmer v. Brennan, 511 U.S. 825, 846 (1994).  Travillion must show a substantial risk of serious harm, Defendants' deliberate indifference to that risk, and that the deliberate indifference *caused* him *some* harm, not necessarily *serious*

---

[16] We express no opinion on the reasonableness of Defendants' actions in not restraining Johnson and whether Travillion could succeed in state law claims on this issue.

harm. See Hamilton, 117 F.3d at 746; Bistrian, 696 F.3d at 367 (a claim for damages must show "(3) the official's deliberate indifference caused him *harm*." (emphasis added)).[17]  While the degree of injury may be a relevant consideration for a determination of damages, it is not a threshold issue that would defeat a failure to protect claim at the summary judgment stage.[18]  Here, Travillion did allege that he suffered harm, as the attack resulted in vomiting, a possible concussion, and sciatic nerve damage.[19]

## III. Conclusion

In summation, we agree with the District Court that Travillion failed to exhaust his administrative remedies with regard to the denial of adequate medical care claim against Defendants Perks and Weaver.  We also agree with the District Court that Travillion has

---

[17] Causation is not challenged or at issue here.

[18] Even in Eighth Amendment claims against prison officials for use of excessive force—a claim where one of the factors to consider is, explicitly, the extent of injury—we have recognized that a showing of "significant" or "serious" injury is not necessary to make an Eighth Amendment claim.  See Brooks v. Kyler, 204 F.3d 102, 107–09 (3d Cir. 2000) (concluding that a prisoner who testifies he was violently beaten by three prison guards, but who adduces no objective evidence of anything but *de minimis* injuries, may survive a summary judgment motion on his Eighth Amendment claim); see also Smith v. Mensinger, 293 F.3d 641, 649 (3d Cir. 2002) (noting that when there have been *de minimis* injuries,  "[a] properly instructed fact finder could . . . [conclude] the force used was not of constitutional dimension," but that such "is an issue of fact to be resolved by the fact finder based upon the totality of the evidence; it is not an issue of law a court can decide.").

[19] Travillion also alleges he suffers from emotional injuries, which include nightmares, severe anxiety, and insomnia.  Dkt. #1 at 23.  As these emotional injuries accompany a showing of physical injuries that are more than *de minimis*, they are not barred from consideration.  See Mitchell v. Horn, 318 F.3d 523, 533–36 (3d Cir. 2003).

17

presented no evidence that Defendants Gates or Druckemiller possessed any actual knowledge of the threat posed by Johnson prior to placing Travillion in the cell on June 14.[20] However, we conclude the District Court erred in ruling that Travillion's claims with regard to Defendants Kearns, Burton, Sherman, Crawford, and Stover were procedurally barred. Whether a genuine issue of material fact exists with regard to these Defendants' subjective knowledge should be considered by the District Court on remand. Furthermore, we conclude that genuine disputes of material fact exist with regard to Defendants Clark, Hardy, Sutton, Rutherford, and Duncan. Consequently, for the foregoing reasons, we will affirm the judgment in part and vacate and remand in part for further proceedings in accordance with this opinion.[21]

---

[20] We acknowledge Travillion's letter filed under Fed. R. App. P. 28(j), citing Palakovic v. Wetzel, 854 F.3d 209 (3d Cir. 2017), as supplemental authority. Travillion could have cited that authority in his opening brief. See Beazer East, Inc. v. Mead Corp., 525 F.3d 255, 264 (3d Cir. 2008). But even if the argument were not waived, Palakovic was a prison suicide case, and our acknowledgment in that opinion of the mental and physical harm that can stem from lengthy exposure to solitary confinement was limited to the *person who endured solitary confinement*—the opinion does not posit that a person who is later removed from solitary is an obvious danger to *others* for purposes of the Eighth Amendment. See Palakovic, 854 F.3d at 225–26.

[21] Travillion does not challenge the District Court's decision declining to exercise supplemental jurisdiction on the state law claims. However, because we are remanding this case, the District Court may wish to revisit its ruling.

We deny Travillion's motion to appoint counsel.[22]

---

[22] The District Court may wish to consider appointing counsel sua sponte on remand. In his motion, which we have also construed as his reply brief, Travillion raises, among other things, concerns regarding discovery issues in the District Court. We will not address those concerns here. See Gambino v. Morris, 134 F.3d 156, 161 n.10 (3d Cir. 1998) (noting that arguments raised for the first time in a reply brief will not be addressed). But, Travillion may raise his concerns in the District Court, if appropriate.